**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Giovanni LIGNAROLO and Mario Lignarolo, Defendants-Appellants.**

No. 83–5243.

United States Court of Appeals,
Eleventh Circuit.

Sept. 10, 1985.

Michael J. Osman, Joseph Beeler, Miami, Fla., James McGuirk, Coral Gables, Fla., for defendants-appellants.

Stanley Marcus, U.S. Atty., Robert J. Bondi, Linda Collins-Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before RONEY and TJOFLAT, Circuit Judges, and BROWN,* Senior Circuit Judge.

---

* Honorable John R. Brown, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

This appeal presents the question of whether one can be convicted under the Travel Act, 18 U.S.C. § 1952(a)(1) (1982), by traveling from one state to another to "launder" the cash receipts of drug traffickers. We answer the question in the affirmative.

## I.

### A.

In 1979, the Federal Bureau of Investigation (FBI) discovered that the cash deposits at the Continental Bank in Miami, Florida were unusually large. Many of the deposits were being made to the accounts of persons or entities living or located in South America, principally Colombia, and the FBI suspected that some of the money originated from drug transactions. To identify the drug traffickers and their money launderers, the bureau set up a "sting" operation in Miami, called Operation Bancoshares.

The FBI's intelligence information indicated that Orlando Arrebola, a Continental Bank vice-president, was involved in the laundering of drug money. On September 5, 1979, Agent Uriarte contacted Arrebola at the bank for the stated purpose of opening a business account at the bank. The account was to be in the name of CRV Associates, a corporation set up by the FBI. Agent Uriarte told Arrebola that he needed someone he could trust to handle the account and that he had been informed that Arrebola was the man to see. Arrebola agreed to handle the account.

Once the bank account was opened, FBI agents, working undercover, proceeded to build credibility as money launderers. Among other things, they had CRV transfer by wire $500,000 furnished by the U.S. Department of the Treasury from Continental Bank in Miami to Citibank in New York City, where CRV had another account, and back to Continental, several times, to create the appearance that CRV was moving large amounts of money. In addition, FBI agents made frequent cash deposits of over $100,000 to CRV's Continental account; the agents would bring the money in attache cases and give extravagant tips to the bank employees who helped in counting it.

During a conversation on October 12, 1979, Agent Uriarte told Arrebola that he could "collect" anywhere in the country and asked Arrebola if he knew of anyone who had problems in New York. Arrebola acknowledged that he knew someone who had $2 million in New York but had no way to send it to Miami,[1] and that he, Arrebola, "did not have time." Arrebola offered to put this person in touch with Agent Uriarte. He added that he knew a lot of other people in New York with the same problem and that now he could refer them to CRV.

On November 28, 1979, Agents Franco and Avakian,[2] CRV operatives working under the assumed names of Jose Antonia Fernandez and Charles Rana, attempted to get advice from Arrebola on how they could get some Italian people in New York Colombian drug connections who could use CRV to "move" their drug profits. Arrebola said that he could solve the agents' problem; he had a partner who was sending "merchandise" from Colombia to the United States and bringing money back to Colombia. He described his partner as a thirty-year-old Colombian who owned five money exchange houses in Colombia and who was capable of moving two to three million dollars a day. Arrebola said that he would talk to his partner and that a meeting between his partner and the Italians could be arranged.

Two days later, Agent Franco telephoned Arrebola, told him that his man from New

---

1. Arrebola told Agent Uriarte that at least half of the banks in New York City refused to accept large "cash" deposits; thus, it was difficult to transfer drug money through banking channels from New York City to Miami.

2. Agent Uriarte left the Bancoshares operation in October 1979 and thus was not involved in the money laundering that formed the basis for the indictment in this case.

York was in Miami, and asked if a meeting could be arranged with Arrebola's partner. The meeting took place on December 3, at CRV's office. Those present were Arrebola, his partner, Luis Fernandez Vasquez, and Agents Avakian and Franco. During the meeting, Agent Franco reiterated that he knew a group of people in New York who needed a supplier of cocaine and marijuana, but that CRV was interested only in "moving" drug money; it would not deal with the drugs themselves. Vasquez explained that, although he personally did not sell cocaine or marijuana, he "moved" drug money all over the United States and to Colombia. Vasquez did not have a bank in New York that could be trusted, as he had in Miami. The agents offered Vasquez the use of CRV's corporate account at Citibank in New York City, stating that his money could be deposited there and transferred by wire to Miami. On December 12, the agents, Arrebola, Vasquez, and Moises Musa Assaf, an associate of Vasquez, assembled at Arrebola's office. Agent Avakian, Assaf, and Vasquez discussed the movement of money from New York City. Agent Avakian again offered the use of CRV's Citibank account, and Vasquez agreed to contact him if a New York deal, which Vasquez expected to total $4 million, came through.

On December 19, Agent Franco flew to New York City and met Moises Assaf in the lobby of Citibank. Assaf introduced Agent Franco to appellant Mario Lignarolo, who was carrying a large brown shoulder bag containing $350,000 in cash. Agent Franco deposited the money in CRV's account. As they were leaving the bank, Lignarolo asked if the bank would be open on Saturday because he would have $1.5 million to deposit that day. Later, Assaf apologized to Agent Franco for the small amount of the deposit, explaining that he had been told that it would be $2 million. Lignarolo then told Franco that there would be several more deposits because the entire proceeds from the marijuana shipment would be $2.6 million. He also said that another marijuana shipment was on its way from Colombia to New York, but that that would be another deal. On December 21, Assaf came to CRV's Miami office to pick up a check for the money he and Mario Lignarolo had given Agent Franco to deposit in New York City. Assaf requested that the check be made out to Promotora del Caribe, a Colombian business firm.[3]

On December 22, Agents Franco and Avakian again flew to New York City. Assaf met them at the airport and drove them to the Waldorf Astoria where they joined Mario Lignarolo. Lignarolo went up to his room, and the agents and Assaf joined him shortly thereafter. On the bed was a tan leather suitcase containing approximately $700,000. Soon two other people came to the room; they were introduced to the agents as "Dominic"[4] and "Luis Quetero." Everyone there except Quetero counted the money from the suitcase. As it was being counted, Lignarolo put $15,000 in his pocket and gave Quetero $1,000. Assaf told Agent Franco that this "load" was Quetero's. Dominic said that the total amount of the "load" was $2.3 million and that the next payment would be made on either January 2 or 3. Mario Lignarolo then gave Agent Franco the remainder of the money, $684,000, which Franco deposited in CRV's Citibank account. The money was later transferred by wire to CRV's account at the Continental Bank in Miami.

On December 26, Arrebola instructed Agent Franco that CRV should make out a check for $500,000 to Promotora del Caribe. The next day, Assaf went to CRV's office to collect the balance of the $684,000 deposit (less CRV's fee) that had been wired from New York City. Assaf told the agents there that another pick-up of $1 million would take place in New York City on January 2 or 3.

---

**3.** Agent Franco made the check out for $345,-095. The difference of $4,905 represented CRV's fees for transferring the money: one percent for over $500,000, and two percent for under $500,000.

**4.** Although it was not made clear at trial, Dominic often used the name Mel and may also have been known as Pete or Pedro.

On January 3, 1980, Agents Franco and Avakian met with Vasquez, Assaf, and appellant Giovanni Lignarolo, Mario's brother, at CRV's Miami office. During a discussion of ways to transfer money, a business in which Giovanni professed to have a great deal of expertise, Agent Avakian asked why more money was always promised than was actually delivered in New York. Giovanni answered, "I think they are still selling the stuff ... you know and they haven't been able to ... sell everything."

Agents Franco and Avakian traveled to New York City again, on January 7, and met Giovanni Lignarolo and Assaf in the lobby of the Waldorf Astoria. The four men immediately went up to a room in the hotel. Lignarolo and Assaf then departed, to an adjoining room, and returned with two suitcases containing approximately $1 million in cash. Assaf told the agents that the money, with the exception of $100,000 that he and Giovanni Lignarolo would carry to Miami to pay some people, was to be deposited in CRV's Citibank account and wired to the Victor M. Sasson account at the Flagship Bank in Miami. The agents made the deposit on January 24, and Assaf told Agent Franco that the money had come from the sale of a boatload of marijuana and that he had taken care of Arrebola.

On March 4, Vasquez and Assaf met with the agents at CRV's office and told them that on the next deal both Giovanni Lignarolo and Assaf would go to New York. On March 6, the agents met the two men at the Waldorf Astoria, and, after the four of them together counted out $614,000 in cash, the agents deposited the money in CRV's Citibank account. Giovanni Lignarolo told the agents that he expected two more deliveries, approximating $1 million, later that evening. The following morning, the agents again met with Lignarolo and Assaf who instructed them to wire the money deposited the previous day to the Victor Sasson account at the Republic National Bank in New York City. Later in

the day, Lignarolo told the agents that the additional money he expected had not been delivered. He made several phone calls and spoke with a man named Pete or Pedro,[5] purportedly a member of an Italian family that was well connected with the marijuana business in the New York City area. Lignarolo told the agents that the money would be delivered on March 16.

On March 17, Agents Franco and Avakian met Giovanni Lignarolo, Assaf, and two Italians, Dominic and Anthony, at the Hilton Hotel in New York City. The six men went up to a hotel room and counted money. While they were counting, Dominic told Agent Franco that he owned a shrimp boat and an island hopper, used the boats to smuggle large quantities of marijuana, and that the money they were counting came from marijuana. The money totalled $934,000, $827,000 of which was deposited in CRV's Citibank account. Of the $107,-000 remaining, Giovanni took $100,000 and Assaf $7,000. The next day Assaf instructed the agents to wire the deposited funds to the Financiara del Norte account at Continental Bank in Miami.

### B.

On July 31, 1981, the two appellants, Mario and Giovanni Lignarolo, Arrebola, Vasquez, and Assaf were indicted in the Southern District of Florida. All were charged under 18 U.S.C. § 371 (1982) with conspiring to violate the Travel Act, 18 U.S.C. § 1952(a)(1) (1982), by traveling in interstate commerce to distribute cash proceeds of marijuana trafficking. One or more of the defendants was charged in each of seven additional counts with having committed a substantive Travel Act offense. The alleged substantive offenses included the five laundering transactions, involving some $3.5 million in funds, we have described *supra*, which took place over a period of less than six months and began in New York City when Agents Franco and Avakian made deposits to CRV's Citibank account. These transac-

---

**5.** *See supra* note 4.

tions were also alleged as overt acts committed by one or more of the defendants in furtherance of the charged conspiracy. The case against the appellants and Arrebola was severed, and they were tried together. Appellants were convicted as charged; Arrebola was acquitted.

In this appeal, appellants challenge the sufficiency of the evidence and the trial court's instructions on the elements of both the conspiracy and substantive offenses.[6] We conclude that the evidence was fully adequate to convict appellants on each count and that the court did not err in instructing the jury.

## II.

### A.

The Travel Act makes it a crime to travel in interstate commerce with the intent to "(1) distribute the proceeds of any unlawful activity; or ... (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity ... *and* thereafter [to] perform[ ] or attempt[ ] to perform any of [such] acts...." 18 U.S.C. § 1952(a)(1), (3) (1982) (emphasis added). An "unlawful activity," within the meaning of the Act, includes "any business enterprise involving ... controlled substances," 18 U.S.C. § 1952(b) (1982), such as marijuana.[7] Appellants and their co-indictees were charged with conspiring to violate, and violating, section 1952(a)(1) by traveling from Miami to New York City to distribute, and thereafter dis-

tributing, the cash proceeds of marijuana transactions.

▮ Section 1952(a)(1) requires that the defendant travel in interstate commerce, with the intent to distribute the proceeds of an unlawful activity, and that he knowingly make such distributions. In the case at hand, therefore, the Government had to prove, with respect to each of the substantive counts, that the defendant traveled from Miami to New York City for the express purpose of collecting proceeds generated by substantial marijuana trafficking, that he collected currency of the United States which he knew constituted such proceeds, and that he distributed that currency by causing the undercover agents to deposit it in CRV's Citibank account and then to wire it to various bank accounts in New York City and Miami. On the facts recited in Part I.A., *supra,* which we portrayed in the light most favorable to the Government, *see United States v. Carter,* 760 F.2d 1568, 1582 (11th Cir.1985), we conclude that a reasonable jury could find appellants guilty beyond a reasonable doubt of the section 1952(a)(1) charges lodged against them.

We also conclude that the trial judge properly charged the jury on these substantive counts. The court instructed the jury that the Government had to prove that appellants traveled from Miami to New York City "in interstate commerce," that they went there intending to distribute the proceeds of a business enterprise trafficking marijuana, and that they thereafter distributed such proceeds with knowledge that they were derived from the enter-

---

**6.** Appellants also claim that Hispanics were underrepresented on the grand jury that indicted them. They raised this issue in a pretrial motion, "adopting" the record made on a challenge to the grand jury in *United States v. Cabrera-Sarmiento,* 533 F.Supp. 799 (S.D.Fla.1982). Appellants failed to present the court with any portion of this "adopted" record, or any other evidence, to support their claim of underrepresentation. The effect of such failure is that we have no record, in the form of testimony, documentary evidence, or stipulations, to review with respect to this issue; all we have is appellants' naked allegation that Hispanics were unlawfully underrepresented on the grand jury.

Hence, appellants' claim must fail. *Cf. United States v. Garcia,* 721 F.2d 721, 723–74 (11th Cir.1983) (defense counsel failed to enter the record or the indictments in a prior case into evidence in a trial involving double jeopardy claim and therefore fell short of establishing a prima facie case). We do note, in passing, that the merits of a claim identical to the one appellants raised was rejected in *Cabrera-Sarmiento, supra,* and, on appeal, in this court in *United States v. Esle,* 743 F.2d 1465 (11th Cir.1984).

**7.** Marijuana is a schedule I controlled substance. 21 U.S.C. § 812 (1982).

prise's sale of marijuana. In sum, the judge fully instructed the jury on the applicable elements of section 1952(a)(1).

Appellants admit that the court's jury instructions on the elements of a section 1952(a)(1) offense tracked the literal language of the statute, but they argue that case law interpreting the statute has created an additional element: the Government must show that the defendant, in distributing the proceeds of an unlawful activity, intended to facilitate that activity. Appellants contend that the Government's proof failed to establish this additional element; hence, they are entitled to an acquittal. Appellants contend, alternatively, that they are entitled to a new trial because the court failed to include the element in its charge to the jury.

Appellants cite *United States v. Gibson Specialty Co.*, 507 F.2d 446 (9th Cir.1974), for their proposition. *Gibson* involved a prosecution under section 1952(a)(3) of the Travel Act. The district court held that the defendants' travel to Montana to sell gaming paraphernalia to illicit gambling enterprises could not violate section 1952(a)(3), even if the defendants knew that they were selling the paraphernalia to violators of state law. The court, therefore, dismissed the indictment for failure to state an offense. The Ninth Circuit, in rejecting the Government's appeal, agreed. It held that the defendants' knowledge of the illegal use their buyers would make of the gaming materials, standing alone, could not render their conduct criminal. To make out a section 1952(a)(3) offense, on the facts presented, the prosecution had to

> show that the manufacturer in some significant manner associated himself with the purchaser's criminal venture for the purpose of its advancement. *Were we not to define intent in the travel act in this manner, the act would be plagued by the very overexpansiveness which Congress sought to rule out by inclu-*

*sion of an express mens rea requirement.*

*Id.* at 449 (emphasis added). The *Gibson* court was concerned about an interpretation of the Travel Act that would impose liability on legitimate businesses supplying merchandise or services to unlawful business enterprises. In the court's view, Congress could not have intended that a supplier be prosecuted merely because he had knowledge of the illicit nature of his customers' business activities; to be criminally responsible he had to associate himself somehow with these activities.[8]

As we have noted, *Gibson* was a section 1952(a)(3) prosecution, in which the Government had to prove that the defendants traveled interstate to "otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity...." The Government did not have such burden of proof here, however, because appellants were charged under section 1952(a)(1). All the Government had to establish was that appellants traveled interstate for the purpose of distributing the proceeds of marijuana transactions and that they knowingly made such distribution. In a section 1952(a)(1) case like this one, it is enough that the Government prove, with respect to this latter element, that the defendant, at the time he distributed the proceeds, knew that they were derived from unlawful activity as defined in section 1952(b).

■■■ The Travel Act was enacted to control the flow of illegal profits and to combat pernicious criminal activities that are multi-jurisdictional. *See* H.R.Rep. No. 966, 87th Cong., 1st Sess. 2, *reprinted in* 1961 U.S.Code Cong. & Ad.News 2664, 2665. It was "primarily designed to stem the 'clandestine flow of profits' " from certain unlawful business activities. *United States v. Nardello*, 393 U.S. 286, 292, 89

---

**8.** The court in *Gibson,* however, gave no hint as to precisely what "association" the prosecution would have to establish to obtain a section 1952(a)(3) conviction. For example, would the prosecutor be required to show that the defend-

ant was a principal of the business enterprise or a conspirator with those who formed and/or operated the enterprise at the time he sold the gaming paraphernalia?

S.Ct. 534, 538, 21 L.Ed.2d 487 (1969) (citation omitted). A clear target of the legislation is the "bagman," the individual who distributes the proceeds of unlawful activities. In his testimony before a House Subcommittee on the Judiciary, Attorney General Robert F. Kennedy explained that, if the Travel Act were enacted, the government would be able "to prosecute the courier who carries the funds across state lines and in conjunction with the aiding and abetting statute [would] be able to prosecute the person who caused the courier to travel—the kingpin." *Legislation Relating to Organized Crime: Hearings Before Subcomm. No. 5 of the House Comm. on the Judiciary,* 87th Cong., 1st Sess. 22 (1961). We hold that, when a person willfully distributes proceeds that he knows were derived from an "unlawful activity," as defined in section 1952(b), he subjects himself to prosecution under section 1952(a)(1).[9] Moreover, if, in distributing such proceeds, such person intends to and does "facilitate the promotion, management, establishment, or carrying on" of the illegal business enterprise, he may have committed a section 1952(a)(3) offense as well.[10] What appellants would have us hold is that, in a section 1952(a)(1) prosecution, the Government must show that, at the time the defendant distributed the ill-gotten proceeds, he was a principal in the criminal enterprise, like a co-conspirator or an aider or abettor. We refuse to read this additional element into the statute.[11]

**9.** Appellants were also charged and convicted of conspiring to violate 18 U.S.C. § 1952 (1982) in violation of 18 U.S.C. § 371 (1982). In order to sustain a conviction for conspiracy, the government must establish beyond a reasonable doubt that: (1) a conspiracy existed; (2) the defendant knew of the conspiracy; and (3) the defendant voluntarily participated in the conspiracy. *United States v. Lippner,* 676 F.2d 456, 466 (11th Cir.1982); *United States v. Garcia,* 672 F.2d 1349, 1369 (11th Cir.1982). Evidence of an overt act committed by one of the conspirators in furtherance of the conspiracy is also required. 18 U.S.C. § 371 (1982); *see also United States v. Tombrello,* 666 F.2d 485, 490 (11th Cir.), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982). The Government, however, need not present direct evidence of an agreement between the co-conspirators; the agreement may be inferred from concert of action. *United States v. Hartley,* 678 F.2d 961, 972 (11th Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 and 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983). Participation in the conspiracy may be implied from a defendant's acts in furtherance of the purpose of the conspiracy. *United States v. Kopituk,* 690 F.2d 1289, 1323 (11th Cir.1982).

Appellants' argument against their conspiracy convictions mirrors their assault on the substantive violations: that section 1952(a)(1) requires, in addition to knowledge that the funds distributed were illegally obtained, an intent to facilitate the unlawful activity of the business enterprise. We have rejected this argument as it applied to the section 1952 convictions and find it no more persuasive in the conspiracy context.

**10.** It may be true, in a given case, that the laundering of money is an essential component of drug trafficking; as such, it facilitates the business. "Importers, wholesalers, purchasers of cutting materials, and persons who 'wash' money are all as necessary to the success of the venture as is the retailer. They can all be held to have agreed with one another in what has been called a 'chain' conspiracy." *United States v. Barnes,* 604 F.2d 121, 154–55 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Agreements to engage in actions that are integral to a drug venture prohibited by 21 U.S.C. § 841 (1982), such as laundering proceeds, violate 21 U.S.C. § 846 (1982) as they are conspiracies to aid and abet the distribution of controlled substances. *United States v. Orozco-Prada,* 732 F.2d 1076, 1080 (2d Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 154, 83 L.Ed.2d 92 and — U.S. —, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984).

**11.** Appellants and *Amicus,* The National Association of Criminal Defense Lawyers, Inc. and The Florida Criminal Defense Attorneys Association, warn against applying the Travel Act to otherwise legitimate businessmen who merely happen to provide an unlawful enterprise with materials or services. Arguing that no businessman should be required to inquire into the background of his customer, they march before the court a parade of horribles which they prophesy such an application would create. We note, first, that not requiring a businessman to inquire into the activities of his customers says nothing as to his obligations once he happens to become aware of such activities. Second, our holding does not encompass businessmen who provide otherwise lawful services and products to an unlawful business enterprise. Our ruling is limited to individuals who knowingly distribute and launder proceeds of an unlawful activity as defined in section 1952(b), a result in harmony both with the practicalities of the business community and the legislative history of the Travel Act.

## B.

■ Appellants contend that the trial court, in instructing the jury, failed to give it adequate guidance as to the definition of a "business enterprise" as the term is used in the statute. We note that the term is not defined in the statute itself.[12] Courts, however, have consistently construed the term to require a continuous course of conduct, rather than a sporadic, casual course of events. *United States v. Corbin*, 662 F.2d 1066, 1072 (4th Cir.1981). *See also* H.R.Rep. No. 966, 87th Cong., 1st Sess. 3, *reprinted in* 1961 U.S.Code Cong. & Ad. News 2664, 2666. The trial judge, here, properly employed this standard when he instructed the jury that "[w]hat must be proved beyond a reasonable doubt is that the enterprise engaged in a continuous course of conduct or series of transactions other than casual or sporadic or isolated activity." Accordingly, we find no fault in the court's handling of the "business enterprise" issue.

■ Appellants contend that the evidence was insufficient to support a finding of the existence of a business enterprise involved in marijuana trafficking. The evidence presented at trial painted a picture not of isolated sales of small amounts of marijuana on street corners, but of a massive and excessively profitable marijuana operation. As mentioned in Part I.A., *supra*, Mario Lignarolo, upon giving the first $350,000 installment of drug proceeds to the agents, promised more deposits because the marijuana shipment would total $2.6 million. In less than six months, the agents deposited $3.5 million in CRV's account, hardly the profits of casual or sporadic activity:

[I]t is difficult to characterize active participation in a massive operation to import and distribute marihuana as "casual involvement." The alleged conduct shows a profit or business purpose and the scope of the endeavor certainly warrants calling it an enterprise. The alleged activities constituted a "business enterprise" within any reasonable construction of that phrase and "where the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended [by Congress]."

*United States v. Bergdoll*, 412 F.Supp. 1308, 1315 (D.Del.1976) (quoting *United States v. Missouri Pacific R.R.*, 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929)). *See also United States v. Cozzetti*, 441 F.2d 344, 348 (9th Cir.1971) (indications that operation was intended to be profitable over a period of time was sufficient for section 1952(b) purposes, even if the operation terminated shortly after commencing).

In addition, the activities of appellants and others did display temporal continuity. The $3.5 million was collected by the agents over six months and five trips to New York City. The jury was certainly entitled to infer that several installments were necessary because of the ongoing merchandising of the drugs in New York, particularly when this was all but stated by Giovanni Lignarolo in his January 3, 1980 meeting with the agents: "I think they are still selling the stuff ... you know and they haven't been able to ... sell everything." Appellants seem to believe that, if there was only one shipment of marijuana,

---

**12.** The Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1961–1968 (1982), defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1982). Under this standard, it is sufficient for the government to show an amoeba-like infrastructure that controls a criminal network, "a myriopod criminal network, loosely connected...." *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Although RICO, unlike the Travel Act, has a liberal construction clause, Pub.L. No. 91–452, tit. IX, 84 Stat. 941, 947 (1970), it too was enacted to deal with organized crime and is therefore of some aid in interpreting similar language in section 1952.

a continuous business enterprise for the purposes of section 1952(b) could not be found. But clearly, the continuing distribution of marijuana and the generation over time of large profits satisfied the requirements of a business enterprise under section 1952(b). The verdict, then, would be supported even if the jury were presented with evidence of only one marijuana shipment. The testimony suggested, however, that multiple shipments of marijuana were contemplated. Agent Franco testified that, while counting out $827,000 on March 17, 1980, Dominic told him that the money they were counting came from the sale of marijuana and that he owned a shrimp boat and an island hopper which he used to import large quantities of marijuana. That appellants were aware of the multiple shipments was supported by Agent Franco's testimony that, on December 19, 1979, during his first meeting with Mario Lignarolo, Mario mentioned that, in addition to the marijuana shipment whose proceeds they were to obtain, another marijuana shipment was on its way from Colombia to New York, but that that would be another deal. This evidence was sufficient to sustain a finding that a business enterprise did exist for the purposes of section 1952(b).

▆▆▆▆ Finally, appellants contend that the court failed to instruct the jury as to the meaning of "distribute"; they also suggest that there was insufficient evidence for the jury to find that such distribution occurred. The district judge instructed the jury that distribution was an element of a section 1952(a)(1) violation but declined to

elaborate on the meaning of the term. The term distribute, however, is not endowed with such legal meaning as to require a judge to provide a definition to the jury. The term was employed in its everyday use. Such terms as "distribute," being within the common understanding of a juror, did not require trial court elaboration.[13] *United States v. Crockett*, 506 F.2d 759, 762 (5th Cir.), *cert. denied*, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975). *See also United States v. Pepe*, 747 F.2d 632, 675 n. 78 (11th Cir.1984) ("It is well settled that a court need not define terms that are not unduly technical or ambiguous or that are within the common understanding of the jury.").

▆▆▆▆ The jury had sufficient evidence to find that the appellants distributed the proceeds of an unlawful activity as defined in section 1952. The evidence at trial showed that money was eventually distributed, on appellants' instructions, to four different accounts: $1,037,442 went to the Promotora del Caribe account at the Continental Bank in Miami; $1 million was transferred to the Sasson account at the Flagship Bank in Miami; $614,000 was transferred to the Sasson account at the Republic Bank in New York; and $857,500 was transferred to the Financiera del Norte account at the Continental Bank in Miami. The evidence presented at trial showed that at least one of these accounts, Promotora del Caribe, belonged to a Colombian business. A reasonable jury, in light of the appellants' activity, could infer that these accounts were owned by other members of the business enterprise.[14] Even ignoring

---

**13.** A district judge, for instance, is not required to give a special instruction defining "distribute" in prosecutions under Title 21 of the United States Code (distribution of narcotics or controlled substances). *United States v. Beasley*, 519 F.2d 233, 245 (5th Cir.1975), *vacated on other grounds*, 425 U.S. 956, 96 S.Ct. 1736, 48 L.Ed.2d 201 (1976).

**14.** The evidence presented at trial suggested other occasions where drug money might have been distributed to other members of the business enterprise. Agent Franco testified that at

the January 7, 1980 meeting, in which approximately $1 million in cash was counted, Assaf told him that Mario and Giovanni Lignarolo were taking $100,000 back to Miami to pay people. Agent Franco also testified that on March 17, 1980, after counting out $827,000 to be deposited to CRV's account, Giovanni Lignarolo took $100,000 of the remaining money. This testimony further supports the theory that Giovanni Lignarolo distributed illegally obtained proceeds to other members of an unlawful business enterprise.

the transfer of money to these accounts, however, appellants distributed the proceeds of an unlawful activity when they gave the money to the agents to deposit into CRV's account; this was the first step in the transmission of the proceeds to other members of the unlawful activity. Knowledgeable involvement in any link of such a chain of distribution triggers liability under section 1952(a)(1).[15]

Because we find that the evidence was sufficient to sustain appellants' convictions and that no reversible error occurred during the course of their trial, the judgments of the district court are

AFFIRMED.

---

15. Appellants also contend that the district judge's instruction to the jury constructively amended the indictment. The indictment characterized the business enterprise as one involved in the distribution of marijuana. The district judge instructed the jury that the business enterprise must simply involve marijuana. A constructive amendment to the indictment occurs where the jury instructions "so modif[y] the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." *United States v. Ylda*, 653 F.2d 912, 914 (5th Cir.1981) (In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted the case law of the former Fifth Circuit handed down as of September 30, 1981.) In making this assessment, however, the court must distinguish between an expansive reading of the indictment that requires reversal and a variance that is harmless error. *Ylda*, 653 F.2d at 913–14. Appellants rely on *United States*

*v. Salinas*, 601 F.2d 1279 (5th Cir.1979), *modified*, 610 F.2d 250 (5th Cir.1980). In *Salinas* the defendants were charged with violations of 18 U.S.C. § 656 (1982), an essential element of which is that defendant be "an officer, director, agent or employee of ... [a] bank." The grand jury charged Salinas as a "director." The trial judge instructed the jury that the Government only had to prove that Salinas was "an officer, director, agent or employee of the bank." *Id.* at 1287. The reviewing court properly held the instruction a constructive amendment of the indictment because it altered an essential element of the crime charged. In the case before us, however, the method of involvement of a business enterprise in the illegal activity is not an essential element of proof; section 1952(b) requires only that the business enterprise be "involved in controlled substances." We find that, in this case, the deviation from the indictment concerning a non-essential element of proof did not prejudice the appellants.