### UNITED STATES of America, Plaintiff–Appellee,

v.

### Everett POARCH, Defendant–Appellant.

### No. 88–3769.

United States Court of Appeals, Eleventh Circuit.

Aug. 3, 1989.

Henry M. Coxe, III, Jacksonville, Fla., for defendant-appellant.

Joseph Magri, U.S. Atty., Richard Alan Poole, Asst. U.S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before HILL and EDMONDSON, Circuit Judges, and GARZA *, Senior Circuit Judge.

GARZA, Senior Circuit Judge:

Everett Poarch was convicted of one count of conspiring to defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions of the United States Department of Defense in its negotiation of a defense contract in violation of 18 U.S.C. Sec. 371, and one count of knowingly falsifying, concealing or covering up a material fact in a matter within the jurisdiction of the Defense Logistics Agency, in violation of 18 U.S.C. Secs. 1001 & 2. Specifically, Poarch was convicted of providing incomplete and misleading cost and pricing data on an aircraft renovation project on which he worked, as an employee of Aero Corporation, for the Department of Defense.

Poarch appeals his conviction, alleging discrepancies between the indictment and the jury charge, as well as arguing that he should have been granted a judgment of acquittal due to insufficiency of the evidence on the issue of Poarch's duty to supply accurate and complete information regarding the contract hours to the government. Because we find Poarch's allegations of error to be without merit, we must affirm his conviction.

*Background*

In the early 1980's, Aero Corporation ("Aero") successfully bid on and received a contract with the Department of Defense ("DOD") for the rehabilitation of Air Force C–130 aircraft. Subsequent to the execution of the basic contract, Aero and DOD reached an agreement on a contract modification to structurally renovate the center

* Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

wing section of the aircraft. While renovating the center wing area, Aero employees found that the electrical wiring in the center wing area was not serviceable, and negotiated a separate contract with the government to perform the necessary wiring on the center wing area; this rewiring was referred to as "over and above" work.

The basic contract was at a fixed-price, while the over and above work was performed at a rate of $22/hour. Aero and DOD agreed to a "learning curve" whereby Aero would be allotted 4200 hours to complete the first plane, with the time declining gradually to 3620 hours for the last plane. This time frame was based on representations by Aero that work on the first plane had taken about 4200 hours.

However, by Aero's own admission, the work required on the first plane was less than 4200; actually, it was 3671.9. A government witness, Leon Wiggins, who was an Industrial Specialist under the supervision of Martha Wright, testified that he negotiated the pricing arrangement based on a representation by company employees that the work performed on the first aircraft had required 4200 hours.

An Aero employee testified that Everett Poarch, the Contracts Administrator for Aero, was aware of the practice at Aero of "upping" the hours required for a job during negotiations. Between March and May of 1984, Poarch stopped to talk to Steve Alford, a line employee, in the hangar where Alford worked. Poarch told Alford to "[b]e damn sure that you charge all the time to your wiring that goes there." Alford asked him "What about my basic?" to which Poarch responded "Forget your basic, charge your over and above first. If you have work after that, then charge it to your basic." This would have the effect of inflating the number of hours spent on over and above work at the expense of work correctly attributable to the basic contract, thus concealing the initial "upping" of contract hours required.

In late Summer of 1984, the Government Administrative Contracting Officer in charge of the Aero contract, Martha Wright, was informed by Wiggins that he was uneasy about the price that had been negotiated. On September 4, 1984, Wright sent a formal request to Aero requesting that the Government auditor be allowed access to records and data involving transactions related to the contract. Over the course of the next three weeks, Wright sent Aero several letters stating that submission by Aero of certified cost and pricing data was necessary, citing the Truth in Negotiations Act, 10 U.S.C. Sec. 2306(f) and the Federal Acquisition Regulations, 48 C.F.R. 15.804–2 as authority for the request.

After initially questioning Wright's authority to demand the data, Aero ultimately provided a form containing data for the first fifteen aircraft on which work was performed. This form was prepared by Aero's comptroller, Brenda Patterson–Ball, after discussion with Poarch. Patterson–Ball admitted that she had deliberately used incomplete data by including only 15 aircraft even though 41 or 42 had been completed in order to maximize the number of hours on the form. This is because the first aircraft took longer to renovate than the subsequent ones, and inclusion of only the early aircraft on the form would make the average hours reported on the form seem higher. Although this act formed one of the bases for Count II of the indictment of Aero, Poarch was not indicted in that count. Aero corporation provided the government with further data on January 23, 1985, in the form of a computer printout of labor hours to government auditor John Sears. However, the hours on this printout were incorrect due to Alford's mischarging time on aircraft 34 through 50.

Aero and the government then entered into negotiations for a contract to perform center wing rewiring on aircraft 54 and subsequent aircraft. Sears analyzed the hours printout and advised Wright that an average of 2304 hours per aircraft was required. Wright then negotiated with Poarch for approximately three days, and they reached agreement that the contract for the subsequent aircraft would allow 2404 hours. After the negotiations,

Wright sent Poarch a form under the Federal Acquisition Regulations containing a certificate that the data supplied were current, accurate, and complete, which Poarch signed.

*Juvy Instructions*

■ Counts I and III of the indictment against Poarch charged that he had violated 18 U.S.C. Sec. 1001 by "falsifying, concealing *and* covering up" material facts within the jurisdiction of the Defense Logistics Agency. The court's jury instructions, however, charged the jury that Poarch could be found guilty if he did "falsify, conceal *or* cover up" a material fact. Poarch argues that the use of the conjunctive "and" in the indictment but the disjunctive "or" in the jury instructions fundamentally an essential element of offense with which he was charged. This, argues Poarch, amounts to a constructive amendment to the indictment, which is reversible error *per se. United States v. Peel*, 837 F.2d 975, 979 (11th Cir.1988).

We do not agree that the court's charge constituted a constructive amendment. A constructive amendment to the indictment occurs where the jury instructions so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the indictment. *United States v. Lignarolo*, 770 F.2d 971, 981 n. 15 (11th Cir.1985), *cert. denied*, 476 U.S. 1105, 106 S.Ct. 1948, 90 L.Ed.2d 358 (1986). In this case, the indictment alleged that Poarch falsified material facts, concealed material facts, and covered up material facts. Under the statute, the government need only show that one of those acts was committed in order to prove guilt.[1] The indictment, however, alleges that all three acts were committed, each of which violates the statute—in effect, the government obtained a more difficult indictment than it was required to by the statute. Our literal application of the *Lignarolo* test forces us to conclude that Poarch could not possibly have been convicted of a ground not alleged in the indictment, since the indictment alleges all three possible grounds for guilt.

Poarch cites the case of *United States v. Salinas*, 601 F.2d 1279 (5th Cir.1979), *modified*, 610 F.2d 250 (5th Cir.1980) in support of his argument. We find this case to be inapposite. *Salinas* involved 18 U.S.C. Sec. 656, a criminal statute applicable to "an officer, director, agent, or employee" of any Federal Reserve Bank. The defendant was indicted as being a director of the bank; the indictment did not allege that Salinas was an officer, agent, or employee. The trial court charged the jury that it could find the defendant guilty if they found that he was an officer, director, agent, or employee, and the jury found the defendant guilty. Upon appeal, the conviction was reversed, because it would have been possible for the jury to base Salinas' guilt on grounds not alleged in the indictment. For example, the jury could have found that the defendant was an agent or an employee, but not a director, even though the indictment only charged that the defendant was a director. This would not be possible in the case at hand, however, since Poarch was indicted for falsifying material facts, concealing material facts and covering up material facts. Since the jury was charged that it could find Poarch guilty if he falsified, concealed, or covered up a material fact, all of which were alleged in the indictment, there could have been no constructive amendment to the indictment, and we therefore must reject Poarch's argument.

*Sufficiency of the Evidence*

■ Poarch also argues that the government's proof at trial was insufficient to support the court's instruction that he had a duty to disclose current, accurate, and complete cost and pricing data as of Sep-

---

1. The statute reads as follows:
   Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or repre-sentations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both. 18 U.S.C. Sec. 1001.

tember 28, 1984, which was the date of a formal request for cost or pricing data sent by Wright to Poarch. Prior to this date, there had been an exchange of correspondence between Aero and Wright regarding the submission of that data. Aero's position had been that Wright did not have statutory authority to demand an audit. Wright's letter of September 28 referenced the Truth in Negotiations Act, 10 U.S.C. Sec. 2306(f) and the implementing regulations as authority for her request. Aero then submitted a contractor's pricing proposal, Form 1411, in response to that request. That form listed the hours experienced for removal, fabrication, and replacement of all center-wing wiring on the first fifteen aircraft. After negotiations for the contract for aircraft 54 and subsequent aircraft was negotiated, Wright required Poarch to sign a Certificate of Current Cost or Pricing Data, which stated that, to the best of Poarch's knowledge and belief, the data submitted in support of the work request are accurate, complete and current as of March 20, 1985. Attached to the certificate was the same data for the first fifteen aircraft that was submitted with Form 1411, even though more than fifteen aircraft had been completed. The effect of this failure to include data on the aircraft completed after the first fifteen was to conceal the fact that the later aircraft took much less time to complete than the earlier ones, and thus may have misled government negotiators to allow more hours for completion of rewiring of aircraft 54 and subsequent aircraft.

We hold that the district court correctly instructed the jury that a legal duty to disclose complete, current, and accurate data arose as a matter of law. Just because Aero and Poarch disputed Wright's authority to request the information does not entitle him to a jury determination as to whether he had a duty to disclose. The duty to disclose arose from 10 U.S.C. Sec. 2306(f)(1), and was triggered by Wright's letter to Poarch. The version of that statute in effect at the time Wright requested data from Aero reads as follows:

A prime contractor or any subcontractor shall be required to submit cost or pric-

ing data under the circumstances listed below, and shall be required to certify that, to the best of his knowledge and belief, the cost or pricing data he submitted was accurate, complete, and current—

(B) prior to the pricing of any contract change or modification for which the price adjustment is expected to exceed $500,000, *or such lesser amount as may be prescribed by the head of the agency.*

10 U.S.C. Sec. 2306(f)(1)(B) (1982) (emphasis supplied).

The term "head of the agency" was defined in Sec. 2303 to mean the Secretary, the Under Secretary, or any Assistant Secretary of the Army, Navy, or Air Force; the Secretary of Transportation; or the Administrator of the National Aeronautics and Space Administration. 10 U.S.C. Sec. 2302(1) (1984). Although Wright, an Administrative Contracting Officer, was not the head of an agency, she was given authority to demand cost or pricing data under the Federal Acquisition Regulations which implement the statute. The Federal Acquisition Regulations in effect at the time Wright demanded data from Aero specified that:

(2) If cost or pricing data are needed of pricing actions over $25,000 and not in excess of $500,000, certified cost or pricing data may be obtained.... The amount of data required to be submitted should be limited to that data necessary to allow the contracting officer to determine the reasonableness of the price. Whenever certified cost or pricing data are required for pricing actions of $500,000 or less, the contracting officer shall document the file to justify the requirement. When awarding a contract of $25,000 or less, the contracting officer shall not require certified cost or pricing data.

(b) When certified cost or pricing data are required, the contracting officer shall require the contractor or prospective contractor to submit to the contracting officer ... the following in support of any proposal:

(1) the cost or pricing data.

(2) a certificate of current cost or pricing data ... certifying that to the best of its knowledge and belief, the cost or pricing data were accurate, complete, and current as of the date of the final agreement on price.

48 C.F.R. 15.804–3 (1984).

It is uncontroverted that the contract modification being negotiated by Poarch and Wright had a value of between $25,000 and $500,000. We find that Wright had statutory authority to require the submission of certified cost or pricing data by Aero, and further that the district court was correct in concluding as a matter of law that the Federal Acquisition Regulations applied to the circumstances of this case and created a duty on the part of Aero to disclose current, accurate, and complete information. *See United States v. Hernando Ospina,* 798 F.2d 1570 (11th Cir. 1986) (holding in a Sec. 1001 concealment case that, as a matter of law, defendants had a duty to file Currency Transaction Reports which arose under the Reporting Act, 31 U.S.C. Sec. 5313, and its implementing regulation, 31 C.F.R. Sec. 103.22(a)(1)); *see also United States v. Tobon–Builes,* 706 F.2d 1092 (11th Cir.1983).

■ Lastly, Poarch argues that Wright failed to document the file to justify her request for Aero's cost and pricing data. After examining the record, we find the file was adequately documented by a memorandum written on September 14, 1984 by Leon Wiggins. That memorandum states that Aero management represented that 4200 hours was required to complete the first plane. It goes on to state that "[s]everal attempts have been made to find out what the actual [hours] are, but so far all efforts have failed. This task needs to be negotiated, soon, so adjustments can be made to provide a more reasonable and fair standard manhour, for Aero and the government." Government Exhibit # 3. The justified concern of the government regarding the fairness of the existing contract and the need to adjust the hours for future work are apparent from the memorandum, and it therefore satisfies the requirement that the file be documented to justify the request for data.

*Conclusion*

We find that the district court's instructions to the jury on the elements of the offense and its conclusion, as a matter of law, that Aero was under a legal duty to disclose current, complete, and accurate cost or pricing data did not constitute error, and Poarch's conviction is therefore AFFIRMED.