772 F.2d 827
 UNITED STATES of America, Plaintiff-Appellee,
v.
Willie WARREN, Jr., a/k/a Kokomo, a/k/a Koke, Richard
Warren, Michael Moore, a/k/a Peanut, a/k/a Michael
Monroe, and Willie Warren, Sr., a/k/a
Black Knight, a/k/a Knight,
Defendants-Appellants.
 No. 83-3539.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 3, 1985.
 
 J. Stanford Lifsey, Tampa, Fla., for Richard Warren.
 Mark P. Bryan, Asst. Fed. Public Defender, Tampa, Fla., for Michael Moore.
 J. Larry Hart, Asst. U.S. Atty., Tampa, Fla., W. Bradford Reynolds, Walter W. Barnett, Mark L. Gross, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., for plaintiff-appellee.
 Edwin R. Ivy, Orlando, Fla., for Willie Warren, Sr.
 F. Malcolm Cunningham, Jr., Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for Willie Warren, Jr.
 Appeals from the United States District Court for the Middle District of Florida.
 Before RONEY and TJOFLAT, Circuit Judges, and BROWN*, Senior Circuit Judge.
 TJOFLAT, Circuit Judge:
 
 
 1
 Appellants were convicted of conspiring to hold, and actually holding, migrant workers in involuntary servitude. They contend that the evidence was insufficient to support their convictions and they ask us to acquit them. Alternatively, appellants seek a new trial on the basis of several trial court rulings. We affirm.I.
 
 
 2
 Appellants Willie Warren, Sr., Richard Warren, Willie Warren, Jr., and Michael Moore operated agricultural labor camps which supplied field workers to farmers in Florida and North Carolina. The operation of these camps, however, involved certain irregularities concerning the recruitment and treatment of laborers. The experiences of three such workers are the basis for the charges for which the appellants were indicted in this case.
 
 
 3
 In September 1980, Richard Warren approached Richard Simmons on a street in Atlanta, Georgia, where Simmons lived, and asked if he was interested in working for one day unloading trucks in Augusta, Georgia. Richard Warren told him that he would bring him back to Atlanta that afternoon. Simmons got into Warren's car, and Warren asked him if he knew of others who would like to work. Simmons directed him to several people, including Michael Davis, who also agreed to go with Warren. Davis was told that he was needed for one day of construction work in Augusta and that he would be returned that evening. Simmons then asked Warren to drive by Simmons' sister's house, where he stayed on occasion, so he could tell his sister where he was going and get his radio. Simmons talked to his sister and picked up his radio, but brought with him no other belongings.
 
 
 4
 Richard Warren drove Simmons, Davis, and the others to Willie Warren, Sr.'s farm labor camp in North Carolina, arriving in late afternoon. During the trip Warren gave each man several bottles of wine. One man jumped out of the car during the ride, but Warren stopped and forced him back into the vehicle. The passengers eventually fell asleep and did not awake until they were in North Carolina. Simmons knew he was in North Carolina only because he saw a sign. Warren told the workers that, "If I told y'all where you were going, y'all would never came with me."
 
 
 5
 At the camp Richard Warren told Simmons that he would be told later when the trucks to be unloaded would arrive. Simmons at this point wished to escape, but he was scared. Willie Warren, Sr. gave Simmons, Davis, and the others wine, cigarettes and a place to sleep.
 
 
 6
 Simmons and Davis were awakened the following day by Willie Warren, Sr. and told to pick potatoes. When Simmons asked about the truck, Warren, Sr. reiterated that they would pick potatoes. Simmons was frightened and had no idea where he was. He asked Warren, Sr. about returning home, but Warren, Sr. told him that they would talk about that later. The workers were brought to a potato field and told to pick. Richard Warren watched the pickers and threatened to report them to Warren, Sr., if they did not work fast enough. Warren, Sr. also threatened them.
 
 
 7
 Neither Simmons nor Davis received any pay on payday. Instead, they were told that they owed Warren, Sr. money for the food they received at their meals. Neither worker, in fact, ever received any money for the work he did while in North Carolina. They did not leave because they were scared, did not know where they were, and had no way out. Warren, Sr. had said in front of the workers that they "done took all my wine and stuff up and I wish I would catch one of them trying to leave here." On another occasion, Warren, Sr. warned that, if he caught anyone trying to leave the camp, he would bring them back and "whoop them." Warren, Sr. allowed Simmons to call his sister to have her send Simmons his unemployment check; he told Simmons that, if the check was delivered, Simmons could go home. The check, however, never arrived.
 
 
 8
 The only people who left the camp did so at night, and some of those people were brought back by Willie Warren, Sr., his bookkeeper, or Richard Warren. When Simmons asked Warren, Sr. on another occasion to take him home, Warren, Sr. said he should stay on one more week and then would be sent home. Simmons had seen Warren, Sr. knock down a woman who was working for him and kick her. He also saw Warren, Sr. threaten her and others with a gun. Warren, Sr. had also threatened Davis with a smoldering piece of rubber hose. Both men feared Warren, Sr. because of stories they had heard from other laborers. On one occasion, Simmons gave food to a friend who was too sick to work. The friend apparently had not been fed on order of Warren, Sr. because he had not worked. Richard Warren saw the food being given and told Simmons that "Dad ain't going to like this" and that he would tell Warren, Sr. Because of Warren, Sr.'s reputation, the threat scared Simmons.
 
 
 9
 Every Sunday while he was in North Carolina Simmons and the other members in his crew worked for Willie Warren, Jr. and Michael Moore.[1] On these occasions Warren, Jr. was in charge of everyone in both his crew and Warren, Sr.'s group, of which Simmons was a member. Moore sometimes watched the workers with a stick in his hand. Simmons saw Moore strike at least one laborer.
 
 
 10
 On several occasions Simmons went into a town near camp. He never asked anyone to help him get home because he did not feel like a free man and he was afraid of the Warrens, based on what he saw and heard in the camp. In November 1980, Warren, Sr. transported his crew to Loughman, Florida. Simmons cooked for the crew at Loughman, which was given only one meal a day. Several days later Willie Warren, Jr. brought his crew to the camp. Simmons cooked for them as well. Warren, Jr. stayed at the camp for a few days. Richard Warren and Michael Moore were also at the Loughman camp; they brought back to camp at least one worker who tried to leave.
 
 
 11
 Simmons escaped ten days after the crews arrived in Florida. He left at night, having seen one of the Warrens bring two people back who had left two days before. He walked along the railroad tracks, until he was found by the police. He explained to them that he was scared and that he had left a migrant camp and was on his way to Atlanta. The police took him to the county line, and from there he walked into a small town. He had no money because he was never paid for any work performed in Florida. From the bus station in town, Simmons contacted his sister, who then arranged by phone to pay for his ticket home.
 
 
 12
 Davis stayed at the Florida camp for a month and a half, receiving no pay and only one meal a day. He left the camp in December 1980 with Sister Catherine, a nun, who periodically visited the camp. He had previously asked Sister Catherine to contact his mother, who, after being contacted by the nun, wired money for Davis' ticket home.
 
 
 13
 The experiences of the two workers were not unique, nor were they the earliest incidents of outrageous behavior at the work camps operated by the appellants. In July 1979, Len Gaston was working in North Carolina for a man named Sonny. One day, while Gaston was walking down a road, Michael Moore drove up in a van and offered to take Gaston back to Sonny's camp. Gaston got into the van, but Moore drove him to a field in which Willie Warren, Jr.'s crew was working, this despite Gaston's protestations to be returned to Sonny's camp. When Gaston tried to leave, Moore grabbed him and told him that he "wasn't going no place." Although Gaston was told he would be paid while at Warren, Jr.'s camp, he was given only five dollars every two weeks. When Gaston complained about not getting paid, he was beaten by Warren, Jr. Moore watched Gaston when he worked in the fields. Occasionally Gaston was told to work for Willie Warren, Sr.
 
 
 14
 Warren, Jr. brought his crew to Florida that year just before Thanksgiving. Gaston was transported on a bus driven by Michael Moore to Apopka, Florida, where they stayed for one month. In December, the crew moved to Loughman and joined Warren, Sr.'s crew. Gaston was paid five dollars every other week by Warren, Jr. He was later turned over to Warren, Sr. and worked for him for two months. Gaston could not leave because he had no money. He got out only after Sister Catherine helped him get his social security money which allowed him to buy a ticket home.
 
 
 15
 These accounts, as well as others,[2] revealed an operation where individuals were picked up under false pretenses, delivered to a labor camp to work long hours for little or no pay,[3] and kept in the fields by poverty, alcohol, threats, and acts of violence. On April 14, 1983, a grand jury in the Middle District of Florida returned a four count indictment against Willie Warren, Sr., Willie Warren, Jr., Richard Warren, and Michael Moore. All four were charged with one count of conspiracy under 18 U.S.C. Sec. 371 (1982)[4] to violate 18 U.S.C. Sec. 1583 (1982),[5] which prohibits enticing persons to go to a place while intending that the persons would then be held as slaves, and 18 U.S.C. Sec. 1584 (1982),[6] which makes it a crime intentionally to hold persons in involuntary servitude. The grand jury cited a number of overt acts as part of the conspiracy, including making false promises, restraining a person from leaving camp, and beating one person. In addition, Warren, Sr., Warren, Jr., and Michael Moore were charged with three counts of violating 18 U.S.C. Sec. 1584, by holding Len Gaston, Michael Davis, and Richard Simmons in involuntary servitude in Loughman, Florida.[7] Richard Warren was indicted on the counts involving Simmons and Davis. The indictment covered a period from July 1979 to December 1980. Appellants were tried before a jury and convicted on all counts in which they were charged.
 
 II.
 
 16
 Appellants argue that the jury lacked sufficient evidence to convict them of some or all of the counts with which they were charged. In examining the sufficiency of the evidence in a criminal case, we must view the evidence in the light most favorable to the government, allowing all reasonable inferences suggested by the evidence, and determine whether a reasonable trier of fact could find that such evidence establishes guilt beyond a reasonable doubt. United States v. Carter, 760 F.2d 1568, 1582 (11th Cir.1985); United States v. Payne, 750 F.2d 844, 855-56 (11th Cir.1985); United States v. Kopituk, 690 F.2d 1289, 1323 (11th Cir.1982), cert. denied, 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 and 461 U.S. 928, 103 S.Ct. 2090, 77 L.Ed.2d 300 and 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). The evidence need not exclude every reasonable hypothesis of innocence or be inconsistent with every conclusion except that of guilt. United States v. Loyd, 743 F.2d 1555, 1560 (11th Cir.1984). We will first examine the elements of the substantive charges of which the appellants were convicted and then review the evidence presented at trial as it relates to each appellant's conviction.
 
 
 17
 Section 1584 of Title 18 prohibits the holding of any individual to involuntary servitude.[8] The statute was designed to enforce the thirteenth amendment of the Constitution which provides that "[n]either slavery nor involuntary servitude ... shall exist within the United States, or any place subject to their jurisdiction." The amendment and the legislation were adopted to eradicate more than the traditional institution of slavery existing in the pre-Civil War South:
 
 
 18
 The undoubted aim of [the amendment and the legislation] was not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States.... [I]n general the defense against oppressive hours, pay, working conditions, or treatment is the right to change employers. When the master can compel and the laborer cannot escape the obligation to go on, there is no power below to redress and no incentive above to relieve a harsh overlordship or unwholesome conditions of work.
 
 
 19
 Pollock v. Williams, 322 U.S. 4, 17-18, 64 S.Ct. 792, 799, 88 L.Ed. 1095 (1944). Various forms of coercion may constitute a holding in involuntary servitude. The use, or threatened use, of physical force to create a climate of fear is the most grotesque example of such coercion. See United States v. Bibbs, 564 F.2d 1165, 1167-68 (5th Cir.1977), cert. denied, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978); see also United States v. Harris, 701 F.2d 1095, 1098 (4th Cir.), cert. denied, 463 U.S. 1214, 103 S.Ct. 3554, 77 L.Ed.2d 1400 (1983); United States v. Booker, 655 F.2d 562, 563 (4th Cir.1981). These cases detail the frightening and all too frequent method by which migrant workers are lured into and kept in involuntary servitude. Often they are tricked into entering the labor camp by the promise of short-term work. See Bibbs, 564 F.2d at 1167. Upon arriving, they are kept for a few days and later informed that they are being charged for meals and other necessities and that they may not leave until the debt is paid. See Booker, 655 F.2d at 563; Bibbs, 564 F.2d at 1167. Threats and acts of violence are then imposed to create a climate of fear which intimidates the workers and prevents them from leaving the camp. See Harris, 701 F.2d at 1098; Booker, 655 F.2d at 563; Bibbs, 654 F.2d at 1167.[9] That the worker had the opportunity to escape is of no moment, if the defendant has placed him in such fear of physical harm that he is afraid to leave. Bibbs, 564 F.2d at 1168.
 
 
 20
 We find that, viewing the evidence in the light most favorable to the Government, there was sufficient evidence for a reasonable jury to convict appellants on all counts charged. The evidence suggested the existence of two labor camps, one run by Willie Warren, Sr. and Richard Warren and the other managed by Willie Warren, Jr. and Michael Moore. We will examine each group separately.
 
 
 21
 Willie Warren, Sr. and Richard Warren operated the labor camp in which Simmons and Davis worked. Neither can seriously maintain that through their actions, as we have set forth in Part I. supra, they did not create a climate of fear that prevented these workers from leaving the camp. Warren, Sr., however, argues that as Gaston was a member of Willie Warren, Jr.'s crew, Warren, Sr. could not be convicted of holding the worker in involuntary servitude.[10] Appellant, however, ignores the fact that, although Gaston worked predominately for Warren, Jr. when in North Carolina, he was told on occasion to work for Warren, Sr., which he did. In addition, while Gaston was with Warren, Jr. in Florida, the crew in December moved from Apopka to Loughman and joined Warren, Sr.'s crew. Finally, Gaston was eventually turned over to Warren, Sr. and worked for him for two months. While Gaston worked for Warren, Sr. in North Carolina, he was never paid. While he worked for Warren, Sr. in Florida, he was paid only five dollars every two weeks. Warren, Sr. imposed the charge on food which created the debt that cost Gaston most of his pay, an indication that Warren, Sr. took sufficient steps in the exploitation and detention of Gaston to support his conviction under count two of the indictment.
 
 
 22
 Willie Warren, Jr. and Michael Moore also raise sufficiency of evidence issues. The evidence clearly supported their convictions for holding Gaston, who worked at their camp, to involuntary servitude.[11] Warren, Jr. and Moore do argue, however, like Warren, Sr., that they could not be convicted of holding workers in involuntary servitude who were not in their crew. Yet Simmons and Davis, although assigned to Warren, Sr.'s crew, worked periodically for Warren, Jr. and Moore in North Carolina, during which time Warren, Jr. and Moore watched over them. Neither Simmons nor Davis were ever paid for their labor. In addition, Warren, Jr. told Simmons to cook for his crew while in Florida, a chore for which he was never paid. Finally, since both Warren, Sr.'s and Warren, Jr.'s crews stayed together at the Loughman camp, the presence of Warren, Jr. and Moore at the camp suggested that the camp was being run by all the appellants. Given Warren, Jr.'s and Moore's prior acts of violence against workers, their being at the camp must have been a factor in discouraging Simmons and Davis from leaving the camp. Such evidence certainly supported the finding that appellants Warren, Jr. and Moore held these two migrant workers in involuntary servitude in violation of section 1584.[12]III.
 
 A.
 
 23
 Appellants allege various other errors on the part of the trial court. First, they argue that it erred in denying their motion to dismiss the indictment on the grounds that the three-year delay between the initiation of the investigation and the indictment made it more difficult for the appellants to locate witnesses and diminished the memory of those they were able to find.[13] In United States v. Lindstrom, 698 F.2d 1154, 1157-58 (11th Cir.1983), we set out the defendants' burden in such a challenge:
 
 
 24
 The due process clause of the fifth amendment, however, requires dismissal of an indictment if a defendant makes a twofold showing: (1) that the delay caused actual prejudice to the conduct of his defense, and (2) that the delay was the product of deliberate action by the government designed to gain a tactical advantage.
 
 
 25
 See also United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); Stoner v. Graddick, 751 F.2d 1535, 1543-44 (11th Cir.1985). The trial court held that appellants failed to make either showing. We agree. The general unavailability of witnesses or loss of memory occasioned by the passage of time does not constitute proof of substantial prejudice. " 'Speculative allegations, such as general allegation of loss of witnesses and failure of memories, are insufficient to demonstrate the actual prejudice required by Marion.' " United States v. Radue, 707 F.2d 493, 495 (11th Cir.) (quoting United States v. McGough, 510 F.2d 598, 604 (5th Cir.1975)), cert. denied, --- U.S. ----, 104 S.Ct. 281, 78 L.Ed.2d 259 (1983). Moreover, although appellants argue that the delay made it difficult to locate witnesses who might have testified in their favor, they did put on six workers in their defense, and appellants gave no indication that the testimony of others who could not be located would have been anything more than cumulative.
 
 
 26
 Even if we were to assume the necessary prejudice, appellants failed to show that the delay was purposefully produced by the Government to gain a tactical advantage. Appellants assert that the Government deliberately delayed the case to prevent them from locating witnesses and to dim the memory of those defense witnesses who did testify. However, they offered no support for this contention. The facts suggest that the delay resulted from the magnitude and complexity of the case. Two grand juries investigated the case for fourteen months and heard twenty-three witnesses.[14] In addition, cases involving multiple defendants require more preparation than do single-defendant cases. To force the Government to indict one of several possible defendants as soon as it has enough information to indict one of them would result in substantial investigative and prosecutive difficulties and duplications. See United States v. Lovasco, 431 U.S. 783, 792-93, 97 S.Ct. 2044, 2049-50, 52 L.Ed.2d 752 (1977).[15] In the absence of the necessary showings of prejudice and deliberate delay, we find that the trial judge properly denied appellants' motion to dismiss the indictment.
 
 
 27
 Appellants raise a host of related issues. They first contend that the trial judge erred in not granting their motion for a continuance which would have given them more time to locate witnesses. The granting of continuances is left to the sound discretion of the trial judge, and his decision will not be set aside on appeal absent a showing of a clear abuse of that discretion. Mekdeci v. Merrell National Laboratories, 711 F.2d 1510, 1520 n. 12 (11th Cir.1983). The trial, originally scheduled for June 13, 1983, was continued once upon appellants' motions until August 4, 1983. Subsequent motions for additional continuances, however, were denied. Appellants have not disclosed what specific prejudice resulted from the denial of further continuances; as a result, we find no abuse of discretion in the trial judge's denial of the motions.
 
 
 28
 Appellants also challenge the trial judge's refusal to order the Government to file a bill of particulars explaining by what specific actions the victims allegedly were held in servitude and naming the persons who took those actions. A denial of a request for a bill of particulars is likewise reversible only on a showing of clear abuse of discretion. United States v. Cole, 755 F.2d 748, 760-61 (11th Cir.1985); United States v. Sherriff, 546 F.2d 604, 606 (5th Cir.1977). The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense. Cole, 755 F.2d at 760; United States v. Mackey, 551 F.2d 967, 970 (5th Cir.1977). The indictment set out in detail the terms of the conspiracy, ten overt acts, and the substantive charges against the appellants, providing them adequate notice of the charges and a full and fair opportunity to prepare their defenses. In addition, the Government provided appellants with a list of unindicted co-conspirators. Generalized discovery is not the proper function of a bill of particulars. United States v. Colson, 662 F.2d 1389, 1391 (11th Cir.1981). Because appellants have failed to show that they were unable to prepare a defense without the requested information, we view the trial judge as having properly denied their request.
 
 
 29
 Appellants argue that the trial judge abused his discretion in refusing to order the Government to file a bill of particulars providing them with photographs and nicknames of the victims referred to in the indictment. Appellants argue that, without such information, they were unable to locate witnesses who might have known the victims and therefore were unable to prepare properly their defense. However, appellants have not pointed to any witness who was unable to remember the victims because he did not recognize the victims' proper names. The propriety of the trial judge's ruling is supported by appellants' decision not to pursue the issue once the trial began. Appellants were able effectively to cross-examine the victims who testified for the Government. In addition, although the nicknames of these victims were revealed during the Government's case, appellants made no attempt to seek a continuance prior to the presentation of their defenses in an effort to find additional witnesses. We view these events as supporting the trial judge's belief that the information was not necessary to appellants' preparation of their defenses. We therefore refuse to find that the trial court abused its discretion.
 
 
 30
 Finally, appellants advance the novel claim that under Fed.R.Crim.P. 16(a) the Government was required to provide them with all statements in its possession made by co-conspirators, which it failed to do. At trial a prosecution witness testified as to out-of-court statements made by a co-conspirator. Appellants complain that they were prejudiced by the trial judge's refusal to order the Government, prior to trial, to provide them with statements made by co-conspirators. While noting that Rule 16(a) does not seem to apply to oral statements made to third parties and that allowing defendants access to co-conspirators' statements would oblige the Government in large organized crime prosecutions, for example, to make available the majority of the evidence it will present at trial, we need not decide the issue; even if appellants were entitled to such information, its absence, like the out-of-court co-conspirator statements, had no effect on the outcome of the case and was thus harmless error.
 
 B.
 
 31
 Appellants also complain that certain testimony placed before the jury was so inflammatory and prejudicial that a mistrial should have been granted. On direct examination, a defense witness, a public health nurse, testified about her treatment of several workers from appellants' camps. On cross-examination she testified that she had met one man in Warren, Jr.'s camp who had been badly beaten and that on another occasion she had a worker, who had apparently been beaten, removed from the camp in an ambulance. Appellants argue that the testimony should have been stricken because the nurse could not link Warren, Jr. directly to the beatings. This contention need little detain us, as appellants failed to preserve the point at trial by choosing not to object to the testimony. In such cases we will not grant relief absent plain error. United States v. Stout, 667 F.2d 1347, 1354 (11th Cir.1982). There could be no plain error because the evidence was clearly relevant to the issue of the existence of a climate of fear in appellants' camps and thus was properly received.
 
 
 32
 The nurse further testified that migrant workers were reluctant to describe the causes of their injuries. She then proceeded to describe her treatment of a woman whose eye had been injured as a result of a beating administered in a labor camp.[16] The witness clearly indicated that the incident was unrelated to the appellants. Finally, the nurse confirmed that bodies and bones of migrant workers had been found in streams in the area, at which point appellants objected and moved for a mistrial. The trial judge denied the motion but immediately cautioned the jury to disregard the statement.
 
 
 33
 In United States v. Slocum, 708 F.2d 587 (11th Cir.1983), we held that:
 
 
 34
 An instruction to disregard evidence withdrawn from the jury is sufficient grounds for an appellate court to uphold a trial court's denial of a motion for mistrial unless the evidence is so highly prejudicial as to be incurable by the trial court's admonition.... Such a level of prejudicial effect exists where there is "a significant possibility ... that ... the stricken statement had a substantial impact upon the verdict of the jury."
 
 
 35
 Id. at 598 (quoting United States v. Arenas-Granada, 487 F.2d 858, 859 (5th Cir.1973)). Unless appellants can demonstrate a "significant possibility" that the statement had a "substantial impact" on the jury's verdict, the verdict must stand. In making a determination of the impact of this testimony, we examine the overall weight of the evidence in support of the verdict. "To require a new trial, the prejudicial effect of improper matter, viewed in the context of that particular trial, must be overwhelmed by evidence of guilt." Arenas-Granada, 487 F.2d at 859. See also Slocum, 708 F.2d at 598. The facts cited in Part I., supra, provided strong support for appellants' convictions, making it very unlikely that the excluded evidence had any effect, much less a "substantial impact," on the jury's verdict. We therefore find no error in the trial judge's refusal to grant a mistrial.
 
 IV.
 
 36
 Appellants allege numerous additional errors which require no discussion, as they are devoid of merit. Having concluded that there was ample evidence to support appellants' convictions and that the trial court gave appellants a fair trial, we affirm those convictions.
 
 
 37
 AFFIRMED.
 
 
 
 *
 Honorable John R. Brown, U.S. Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 The appellants were also known, and were referred to in the testimony at trial, by their nicknames: Willie Warren, Sr. as the Black Knight, Willie Warren, Jr. as Kokomo or Koke, and Michael Moore as Peanut
 
 
 [2]
 Although their experiences were not a basis for appellants' indictment, other migrant workers testified at trial to events that occurred at both Willie Warren, Sr.'s and Willie Warren, Jr.'s camps. Horace Taft, Jr., in September 1979, was approached by a man in Philadelphia, Pennsylvania and asked if he wished to pick produce in Maryland over the weekend. Taft accepted the offer and got into a van driven by Michael Moore. Moore took him not to Maryland but to North Carolina and placed him in Warren, Jr.'s camp. After a few days, Taft told Moore and Warren, Jr. to take him home. They said they would discuss it later, but they never did. In fact, two months later, when the crew was preparing to travel to Florida, Moore and Warren, Jr. told Taft he could not leave to return to Philadelphia. During this time, Taft saw a man, who had tried to leave, brought back to the camp and beaten by Warren, Jr. Taft himself had been beaten by Moore and Warren, Jr., once in North Carolina and once in Florida. He was given only a few dollars on payday and told by Moore and Warren, Jr. that he owed them money for food. Taft was afraid to quit the camp in Florida; he did so only when he got sick and Sister Catherine took him to a clinic
 In January 1980, Arthur Fluker was working on a farm in Immokalee, Florida. One Sunday two men, one of whom was Michael Moore, asked him if he was interested in picking fruit for one day in Ft. Myers. He was told that he would be returned to Immokalee that night. Fluker was taken, however, not to Ft. Myers but to Warren, Jr.'s Loughman camp. When Fluker realized what was happening, he tried to get out of the car while at a service station but was prevented from exiting the car. He felt as though he had been kidnapped. Fluker worked out in the field picking produce. He was watched by Warren, Jr. and Moore, whom he had seen carrying a pistol and a rubber hose. On January 8, 1980 the bus, which was taking the workers from the camp to the field, was in an accident. Fluker was taken to a hospital with a broken hand and was given a prescription and told to return to the hospital in six days. Fluker gave the prescription to Warren, Jr., but Fluker never received the medicine. Fluker complained several times of the pain in his hand, but Warren, Jr. neither had the prescription filled nor returned Fluker to the hospital. Fluker was finally taken to the hospital by Sister Catherine. He had to have surgery on his hand and was hospitalized for four or five days. Fluker received two insurance checks for his injuries and Warren, Jr. took eighty dollars out of the proceeds. Fluker finally left the camp when Sister Catherine arranged to return him to West Palm Beach, where he lived. Fluker did not leave before then because he was afraid to do so and he had no money; by giving Warren, Jr. part of the insurance money, he was able to leave.
 
 
 [3]
 Although the workers were paid little or no wages, we do not mean to suggest that the operation of the camp was unprofitable. Between the period covered in the indictment, July 1979-December 1980, farmers paid Willie Warren, Sr. $260,000 and Willie Warren, Jr. $138,000 for their services
 
 
 [4]
 18 U.S.C. Sec. 371 (1982) provides:
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.
 
 
 [5]
 18 U.S.C. Sec. 1583 (1982) provides:
 Whoever kidnaps or carries away any other person, with the intent that such other person be sold into involuntary servitude, or held as a slave; or
 Whoever entices, persuades, or induces any other person to go on board any vessel or to any other place with the intent that he may be made or held as a slave, or sent out of the country to be so made or held--
 Shall be fined not more than $5,000 or imprisoned not more than five years, or both.
 
 
 [6]
 18 U.S.C. Sec. 1584 (1982) provides:
 Whoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held, shall be fined not more than $5,000 or imprisoned not more than five years, or both.
 
 
 [7]
 Appellants were also charged with aiding and abetting the commission of this substantive offense in violation of 18 U.S.C. Sec. 2 (1982) which provides:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 
 
 [8]
 See supra note 6
 
 
 [9]
 The Ninth Circuit in United States v. Mussry, 726 F.2d 1448 (9th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984), held that an employer who does not use or threaten physical violence can be found, under certain circumstances, to have held a person in involuntary servitude. The defendants in Mussry were indicted for violating 18 U.S.C. Secs. 1581, 1583, 1584 (1982). The bill of particulars alleged that the defendants enticed poor, non-English speaking Indonesians to travel to the United States and, withholding their passports and return airline tickets, required them to work off, as servants, the debts resulting from the costs of their transportation. The trial court dismissed all counts under sections 1581, 1583, and 1584 which failed to allege that the defendants used, or threatened to use, law or force to hold the workers against their will. The Ninth Circuit, however, reversed, holding that "involuntary servitude occurs when an individual coerces another into his service by improper or wrongful conduct that is intended to cause, and does cause, the other person to believe that he or she has no alternative but to perform the labor." Id. at 1453. The court maintained that threats or acts of violence are not a necessary component of such coercion. "The crucial factor is whether a person intends to and does coerce an individual into his services by subjugating the will of the other person." Id
 
 
 [10]
 As we have noted, Richard Warren was not named in count two of the indictment charging the other appellants with holding Gaston in involuntary servitude
 
 
 [11]
 In fact, Warren, Jr. does not even challenge his conviction for this count two offense. Moore does challenge his conviction under this count of the indictment. Moore, through his acts of violence in both North Carolina and Florida, contributed to the climate of fear that helped to dissuade workers from leaving the camp. In addition, as we noted in Part I. supra, Moore was present at the Loughman camp during January 1980, the period in which Gaston was working there, and was seen by Arthur Fluker, a migrant worker, carrying a rubber hose. Such evidence was more than sufficient to support the conviction under count two
 
 
 [12]
 The appellants also challenge their convictions under the conspiracy count of the indictment. The facts, as we detailed them in Part I. supra, clearly supported a finding that appellants conspired as alleged. Appellants further argue that the proof at trial showed two conspiracies rather than one, as was charged in the indictment. Count one of the indictment charged the appellants with conspiring with each other to violate 18 U.S.C. Secs. 1583, 1584. Appellants maintain that the evidence at trial, however, showed two conspiracies, one between Willie Warren, Sr. and Richard Warren, and one between Willie Warren, Jr. and Michael Moore. They allege that this variance between the indictment and the proof at trial was material and requires reversal of their convictions. The evidence, however, indicated a sufficient overlap and commingling of crews to allow a jury to infer that all four appellants agreed to cooperate in a scheme to hold the workers in involuntary servitude. Where an indictment charges a single conspiracy and the government offers evidence to prove a single conspiracy, the existence of a single conspiracy is for the jury to decide. United States v. Russell, 703 F.2d 1243, 1248 (11th Cir.1983)
 Even if the evidence at trial had disclosed two conspiracies, reversal of appellants' convictions would be improper. In addition to showing a variance between the indictment and the evidence presented at trial, appellants must show that the variance affected their substantial rights. United States v. Sutherland, 656 F.2d 1181, 1189-97 (5th Cir.1981), cert. denied, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 and 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982). A defendant's "substantial rights" may be affected where there are so many defendants and evidence of so many separate conspiracies that there is a substantial chance that jurors would transfer evidence of one conspiracy to an unrelated defendant. In Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the Court reversed a conspiracy conviction where, although the indictment charged one conspiracy, the evidence, which was initially directed at 32 defendants, showed at least eight separate conspiracies. The Court carefully distinguished this situation from the one it previously addressed in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), in which the Court upheld a conviction for participation in a single conspiracy where there were only five defendants and two conspiracies proven at trial.
 [I]t is one thing to hold harmless the admission of evidence which took place in the Berger case, where only two conspiracies involving four persons all told were proved, and an entirely different thing to apply the same rule where, as here, only one conspiracy was charged, but eight separate ones were proved, involving at the outset thirty-two defendants.
 Kotteakos, 328 U.S. at 766, 66 S.Ct. at 1249. The Court in Kotteakos drew the line, beyond which there are too many defendants and conspiracies to uphold a conviction for participation in a single conspiracy, "somewhere between [Berger] and this [case]." 328 U.S. at 774, 66 S.Ct. at 1252. This court has followed the Kotteakos rationale. In Russell, supra, we held that there was no chance of "evidentiary spillover" in a case involving four defendants who argued that there were two conspiracies, not one as was alleged in the indictment. In Sutherland, supra, we held that, under Kotteakos, the convictions were to be upheld where the case involved three defendants and two conspiracies. Appellants do not persuade us to abandon this settled doctrine.
 
 
 [13]
 The Government, prior to trial, provided the appellants with copies of Federal Bureau of Investigation investigative reports with the names and addresses of workers the Government interviewed
 
 
 [14]
 The delay resulting from a long grand jury investigation in a case involving multiple defendants does not constitute, standing alone, evidence of deliberate delay on the part of the Government. United States v. Lindstrom, 698 F.2d 1154, 1158-59 (11th Cir.1983)
 
 
 [15]
 Part of the delay was attributable to difficulty encountered by the Government in locating the witnesses for the grand jury proceedings. This court refused to find a similar delay deliberate in Lindstrom where "[t]he government doubtless spent considerable time locating the 199 [witnesses] themselves...." 698 F.2d at 1159
 
 
 [16]
 We quote from the transcript:
 Q Do you remember a particular circumstance or particular events occurring in Nash County in the year 1979 and 1980 that would cause apprehension or explain the sort of apprehension that you saw in persons who you would attempt to treat and find out the nature and cause of their injuries that would account for their silence or reluctance to speak with you, and tell us what that was, please?
 A It would be most difficult for me to--I can recall one specific incident that I will relate to the Court.
 THE COURT: Now, is this something that you saw or heard or something you heard about? What was it?
 THE WITNESS: This is actually a case that I have--
 THE COURT: Could you answer my question?
 THE WITNESS: I saw it.
 THE COURT: All right. Fine.
 A I had a thirty-two year old female walk into my office who had an eye that was completely enucleated from the orbit.
 THE COURT: You are going to have to help us with that. What do you mean by that?
 THE WITNESS: It was hanging out.
 THE COURT: All right.
 BY MR. HART:
 Q This was a laborer?
 A This was a migrant laborer.
 Q This was not connected with the Warrens?
 A You asked for an incident.
 Q I understand that.
 A The lady needed help and I said, "What happened to you?" And she said, "I was beaten."
 I asked her from which camp she came and she told me. I then asked her why was she beaten and she said, "I told him I could not go to work this morning."
 I asked her who beat her and she said, "The henchman."
 THE COURT: The what?
 THE WITNESS: The henchman.
 THE COURT: Would you try to spell that for us as you understand it?
 THE WITNESS: H-i-n-c-h-m-a-n.
 THE COURT: Thank you.
 BY MR. HART:
 Q Ma'am, isn't it also a fact that in the rivers and streams of Nash County in the years 1979 and 1980, they were finding bones and bodies of migrant laborers?
 A That is true.
 MR. ANDERSON: Your Honor, I object to this entire line of testimony. It is highly irrelevant.
 THE COURT: Yeah, I will sustain your objection and I will instruct the jury to disregard that last question and that last answer, ladies and gentlemen.