[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 02-14306
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 2, 2004
THOMAS K. KAHN
CLERK

D. C. Docket No. 01-00074 CR-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHARLES FLOYD PIPKINS,
a.k.a. Sir Charles,
ANDREW MOORE, JR.,
a.k.a. Batman,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(August 2, 2004)**

Before EDMONDSON, Chief Judge, DUBINA and COX, Circuit Judges.

COX, Circuit Judge:

# I. INTRODUCTION

In November of 2001, police arrested fifteen Atlanta pimps. A grand jury subsequently returned a 265-count indictment naming these fifteen pimps, involving conduct spanning from 1997 to November, 2001. Thirteen of the pimps named in the indictment pleaded guilty. Only two – Defendants Charles Floyd Pipkins and Andrew Moore ("the Defendants") – proceeded to trial. The evidence at trial demonstrated that Pipkins and Moore prostituted juvenile females – at least one of whom was as young as 12 – from at least 1997 until their arrest in late 2001. The Defendants were convicted of conspiracy, in violation of 18 U.S.C. § 1962(d), to violate the Racketeering Influenced Corrupt Organizations Act ("RICO"), and of violations of a host of other criminal statutes. They appeal.

Pipkins and Moore raise a number of issues. Most noteworthy is whether the evidence supports the jury's finding that they agreed to participate in an enterprise that met the statutory definition of a RICO enterprise. We affirm the Defendants' convictions and sentences.

## II. BACKGROUND AND PROCEDURAL HISTORY

Defendant Pipkins (known as "Sir Charles") and Defendant Moore (known as "Batman") were pimps who operated in southwest Atlanta in an area around Metropolitan Avenue (formerly called Stewart Avenue) known as the "track."[1]

To persuade underage females to prostitute for them, the Defendants (and other pimps charged in the indictment) presented a vision of ostentatious living, promising fame and fortune. Pimps perpetrated this myth with their own flamboyant dress, flashy jewelry, and exotic, expensive cars. To support this apparently extravagant lifestyle, each pimp kept a stable of prostitutes with a well-defined pecking order. At the top of each pimp's organization was his "bottom girl," a trusted and experienced prostitute or female associate. Next in the pimp's chain of command was a "wife-in-law," a prostitute with supervisory duties similar to those of the bottom girl. A pimp's bottom girl or wife-in-law often worked the track in his stead, running interference for and collecting money from the pimp's other prostitutes. The bottom girl also looked after the pimp's affairs if the pimp was out of town, incarcerated, or otherwise unavailable.

---

[1] Pimps and prostitutes alike rarely refered to each other by their given names; instead, they used street handles such as Sir Charles or Batman.

The pimps also recognized a hierachy among their own. "Popcorn pimps," "wanna-bes," and "hustlers" were the least respected, newer pimps. A "guerilla pimp" (as other pimps and prostitutes considered Moore) primarily used violence and intimidation to control his prostitutes. Others were regarded as "finesse pimps," who excelled in the psychological trickery needed to deceive juvenile females and to retain their services. Finally, "players" (apparently, in this case, Pipkins) were successful, established pimps who were well-respected within the pimp brotherhood.

Both pimps and prostitutes generally referred to their activities as "the game." To the pimps, an important component of the game was domination of their females through endless promises and mentally sapping wordplay, physical violence, and financial control. The pimps created a system in which their prostitutes were incapable of supporting themselves or escaping their reliance on the pimp. A prostitute lived either in her pimp's home or in a room at a motel or boarding house paid for by the pimp. The pimp provided clothes for his prostitute, as well as money for the prostitute to fix her hair and nails. The pimp also provided condoms to the prostitute, or money to buy condoms. Also, the pimp frequently used threats of violence to control his prostitutes, or rewarded his prostitutes with drugs for meeting monetary goals. Other times, a pimp dispensed drugs to a prostitute to ensure that she was able to function through the night and into the early morning hours.

4

The pimping subculture in Atlanta operated under a set of rules, presented in the video called *Really Really Pimpin' in Da South*. This videotape was made in Atlanta by Pipkins and Carlos Glover, a business associate. *Really Really Pimpin' in Da South* featured prominent Atlanta pimps, including Pipkins, explaining the rules of the game. This video, along with its companion piece, *Pimps Up Hoes Down*, outlined the pimp code of conduct, and was repeatedly shown to new pimps and prostitutes alike to concisely explain what was expected of a prostitute. The origin of *Pimps Up Hoes Down* is unknown. In essence, these videos taught that prostitutes were required to perform sexual acts, known as "tricks" or "dates," for money. Prostitutes turned tricks in adult clubs, in parking lots, on mattresses behind local businesses, in cars, in motel rooms, or in rooming houses. A prostitute charged $30 to $80 for each trick, and was required to turn over all of this money to her pimp. Some pimps gave their prostitutes a "quota" to earn over $1,000 a night.

Despite the pimps best efforts to subjugate their prostitutes, the rules allowed a prostitute to move from one pimp to another by "choosing." This was accomplished by the prostitute making her intentions known to the new pimp, and then presenting the new pimp with money, a practice known as "breaking bread." The new pimp would then "serve" the former pimp by notifying him that the prostitute had entered his fold. The former pimp was bound to honor the prostitute's decision to choose her

5

new pimp. A prostitute who frequently moved from pimp to pimp was known as a "Choosey Susie." And, a prostitute might "bounce" from pimp to pimp by moving among different pimps without paying for the privilege of choosing.

Choosing another pimp was not without risk for the prostitute. A prostitute could be punished for merely looking at another pimp; this was considered "reckless eyeballing." Owner pimps apparently were afraid that if their prostitutes were sufficiently impressed with another pimp's vehicle, clothes, and manner, she might choose a new pimp.

Other rules governed a prostitute's conduct. She was required to surrender all of the money from her dates; if she did not, she would be guilty of "cuffing." She was also required to unquestioningly obey her pimp and treat him with respect; if she did not, she was "out of pocket." At the whim of her pimp, a prostitute was obligated to have sexual intercourse with him, another pimp, or even another prostitute.

The pimps sometimes brutally enforced these rules. Prostitutes endured beatings with belts, baseball bats, or "pimp sticks" (two coat hangers wrapped together). The pimps also punished their prostitutes by kicking them, punching them, forcing them to lay naked on the floor and then have sex with another prostitute while others watched, or "trunking" them by locking them in the trunk of a car to teach them a lesson.

The pimps did not service only the Metropolitan Avenue clientele. For example, Pipkins branched out on the Internet, forming a web-based escort service which allowed customers to select a particular prostitute from pictures posted on a website. Also, pimps sometimes sent their prostitutes to Peachtree Street in Midtown Atlanta because patrons paid a premium for prostitutes in that neighborhood. Pipkins entertained members of a municipal police force at his home on at least one occasion, where they engaged in sexual intercourse with his prostitutes.

While all the pimps did not pool their profits from prostitution, some did. And the pimps generally aided each other. Pimps bailed each other's prostitutes out of jail; mentored younger pimps; swapped prostitutes with each other to get a better "fit;" warned other pimps and their prostitutes of the presence of police; provided condoms, rides, and rooms for each other's prostitutes; jointly organized private prostitution parties; recruited juvenile prostitutes together; recruited juvenile prostitutes for each other; divided the track geographically to reduce competition; and traveled out of town together to prostitute females in other cities. Pimps also operated as a price-fixing cartel to regulate the prices that their prostitutes charged for different sexual services.

At trial, four pimps indicted in this case, Michael Davis (known as "Hollywood"), Bryant Weaver Bell (known as "Worm"), Terrance Anderson (known

7

as "Scooby"), and Camari Burrough (known as "KK"), testified on behalf of the Government. Fourteen prostitutes also testified for the Government. At the conclusion of the evidence, the district court submitted twenty-four counts to the jury.

The jury found Pipkins and Moore guilty on Count 1, which charged them with conspiring to participate in a juvenile prostitution enterprise affecting interstate commerce through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). Pipkins was also found guilty on the following counts: Count 8, enticing juveniles to engage in prostitution, in violation of 18 U.S.C. § 2422(b); Count 84, using interstate facilities to carry on prostitution, in violation of 18 U.S.C. § 1952(a)(3); Counts 104 and 105, extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951; Count 172, involuntary servitude, in violation of 18 U.S.C. § 1584; Count 244, transfer of false identification documents, in violation of 18 U.S.C. § 1028; and Count 252, distribution of marijuana and cocaine to minors, in violation of 21 U.S.C. § 859. The jury acquitted Pipkins on the involuntary servitude charge in Count 171.

In addition to Count 1, the jury also found Moore guilty on the following counts: Count 14, enticing juveniles to engage in prostitution; Count 85, using interstate facilities to carry on prostitution; Counts 109, 110, 117-118, extortion; Counts 176, 177, 181, 183, 184, and 185, involuntary servitude; and Count 253,

8

distribution of marijuana and cocaine to minors. The jury acquitted Moore on the involuntary servitude charges in Counts 114 and 116.

The district court sentenced Pipkins to 20 years' imprisonment on Count 1; 5 years' imprisonment on Count 84; 20 years' imprisonment on Count 104; 20 years' imprisonment on Count 105; 20 years' imprisonment on Count 172; and 15 years' imprisonment on Count 244; these sentences to run concurrently. Pipkins was also sentenced to 10 years' imprisonment on Count 252 and 10 years' imprisonment on Count 8, to run concurrently with each other but consecutive to sentences on all other Counts. Thus, Pipkins's total sentence of imprisonment was 30 years.

The district court sentenced Moore to 20 years' imprisonment on Count 1; 15 years' imprisonment on Count 14; 5 years' imprisonment on Count 85; 20 years' imprisonment on Counts 109 and 110; 20 years' imprisonment on Counts 176, 177, and 181; and 40 years' imprisonment on Count 253, all to run concurrently. Moore also received a sentence of 20 years' imprisonment on Counts 117 and 118; and 20 years' imprisonment on Counts 183, 184, and 185, to run concurrently to each other, but consecutive to Count 1. So, Moore's total sentence of imprisonment was 40 years.

III. ISSUES ON APPEAL AND STANDARD OF REVIEW

The Defendants raise several issues on appeal:

A. Whether the evidence was sufficient to support the Defendants' RICO conspiracy convictions;

B. Whether Pipkins's conduct constituted extortion within the meaning of the Hobbs Act;

C. Whether the district court properly instructed the jury on the interstate commerce element of the Hobbs Act;

D. Whether the evidence was sufficient to support Pipkins's involuntary servitude conviction;

E. Whether the evidence was sufficient to support Pipkins's conviction for transfer of false identification documents; and

F. Whether the district court properly calculated Pipkins's and Moore's sentences under the Sentencing Guidelines.[2]

Where issues relative to the sufficiency of the evidence were preserved by a proper motion for judgment of acquittal, we review de novo whether sufficient evidence existed to support the jury's verdict, viewing the evidence "in the light most favorable to the government, with all reasonable inferences and credibility choices

---

[2] Defendants also contend that the evidence was insufficient to show the required effect on interstate commerce needed to support their Hobbs Act convictions for extortion. We have examined the evidence count by count and find this argument meritless. Thus, we reject this argument without further discussion. *See* 11th Cir. R. 36-1.

made in the government's favor"; we will affirm "if a reasonable trier of fact could conclude that the evidence establishes guilt beyond a reasonable doubt." *United States v. Ortiz*, 318 F.3d 1030, 1036 (11th Cir. 2003) (citing *United States v. Miles*, 290 F.3d 1341, 1355 (11th Cir. 2002). The standards of review for other issues are presented in the discussion which follows.

## IV. DISCUSSION

### A. The RICO Conspiracy

Count One charged the Defendants with violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), the substantive RICO statute. It alleged as RICO predicate acts: juvenile prostitution, kidnapping, extortion, money laundering, transferring false identification documents, distributing controlled substances to minors, and making threats of murder. The Government proceeded at trial on a theory that the overall objective of the conspiracy was to make money prostituting juveniles.

To establish a RICO conspiracy, the Government had to prove that the Defendants "objectively manifested, through words or actions, an agreement to participate in . . . the affairs of [an] enterprise through the commission of two or more predicate acts." *United States v. To*, 144 F.3d 737, 744 (11th Cir. 1998) (internal quotations and citations omitted). Specifically, the Defendants must have agreed to

11

participate in (1) an enterprise; (2) that was engaged in or affected interstate commerce; and (3) that engaged in a pattern of racketeering activity. 18 U.S.C. § 1962(c) and (d); *United States v. Starrett*, 55 F. 3d 1525, 1542 (11th Cir. 1995).

To prove that the Defendants conspired to participate in an enterprise, the Government must show agreement on the overall objective, or that the Defendants agreed personally to commit two predicate acts. *United States v. Harriston*, 329 F.3d 779, 785 (11th Cir. 2003). The Government's position at trial was that each of the Defendants committed two or more predicate acts.

Pipkins and Moore contend that their RICO conspiracy convictions should be reversed because the Government failed to prove: (1) the existence of a RICO enterprise, and (2) that the enterprise had the necessary effect on interstate commerce.[3] We examine each of the Defendants' contentions in turn.

1. The RICO Enterprise Issue

The Defendants contend that the evidence at trial was insufficient to prove the existence of a RICO enterprise. "A jury is entitled to infer the existence of an enterprise on the basis of largely or wholly circumstantial evidence. . . . [D]irect

---

[3] The Defendants also argue, to preserve the issue for a petition for rehearing en banc, that the Government failed to prove that the RICO enterprise was distinct from the pattern of racketeering activity, while conceding that under our binding precedent, they can be one and the same. *See United States v. Cagnina*, 697 F.2d 915, 921 (11th Cir. 1983).

evidence of association may be difficult to obtain; a jury [is] permitted to draw the natural inference arising from circumstantial evidence of association." *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978).

Under RICO, an "enterprise" "[i]ncludes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise can consist of "a group of persons associated together for a common purpose of engaging in a course of conduct . . . proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528 (1981).

"[A]n enterprise can exist in the absence of a formally structured group," *United States v. Young*, 906 F.2d 615, 619 (11th Cir. 1990), which can be even "a myriopod criminal network, loosely connected but connected nonetheless." *Elliott*, 571 F.2d at 898. We have held that there is no difference, for enterprise purposes, between a duly elected corporate board and an "amoeba-like infra-structure" in

control of criminal activity.[4]  *See id.*; *United States v. Lignarolo*, 770 F.2d 971, 979 n. 12 (11th Cir. 1985).

The Government invites us to hold that the evidence showed that all of the pimps charged in this indictment constituted a RICO enterprise.  The Defendants, on the other hand, invite us to hold that their convictions cannot stand unless the evidence showed that all of these indicated southwest Atlanta pimps constituted a RICO enterprise.[5]  We decline both invitations, and address a more narrow question: whether  the evidence supports a finding that the Defendants agreed to participate in any RICO enterprise – whether or not the enterprise included all these southwest Atlanta pimps.

---

[4]      We have also accepted the analogy that an enterprise could be as amorphous as a "pick-up" basketball game. *United States v. Valera*, 845 F.2d 923 (11th Cir. 1988).  In *Valera*, the defendant in a drug smuggling operation challenged his RICO conviction, arguing that the drug shipment offloads were discrete conspiracies formed only to accomplish a specific mission rather than a RICO enterprise. *Id.* at 929.  We rejected the defendant's argument, as the evidence showed that the enterprise consisted of a core group of players, with others that would "sub-in" as needed for each shipment. *Id.*  We concluded that "[w]hile there were many ventures or individual conspiracies, there was also one enterprise, one common purpose, and one over-arching conspiracy." *Id.*

[5]      More specifically, the Defendants argue that these Atlanta pimps were not a RICO enterprise because they did not have any organization, hierarchy, or leader (e.g., a "head pimp") that supervised pimping activities.  Furthermore, the Defendants argue, even though pimps interacted as necessary to facilitate the "choosing" and "serving" of the prostitutes, the pimps were actually direct competitors in a fierce market.  About the fact that competing prostitutes often charged identical prices for dates, the Defendants analogize to corner gas stations, explaining that this was due to conscious parallelism.  Finally, the Defendants contend that these pimps did not form a RICO enterprise because they did not have continuity of membership or an outer boundary that prevented outsiders from joining and leaving the group at will.

14

The court's instructions to the jury correctly summarized the definition of a RICO enterprise:

> The term "enterprise" includes any partnership, corporation, association or other legal entity or any union or group of individuals associated in fact although not a legal entity. An association in fact enterprise may consist of a group of persons associated together for a common purpose of engaging in a court of conduct.

> The Government must prove the existence of such an enterprise by evidence of an ongoing organization, formal or informal, and by evidence that the various associates functioned as a continuing unit. So it is – an enterprise is – in this case is people associated in fact together for a common purpose of engaging in a course of conduct that has a continuity to it. It's ongoing.

(R.24 at 1885.)

### a. Pipkins's Enterprise

The evidence at trial supports the jury's finding that Pipkins agreed to participate in an enterprise, the overall objective of which was to make money prostituting juveniles. The evidence presented the jury with at least two possibilities for finding that there was an enterprise: the jury could have concluded that Pipkins and KK were the chief executives in a juvenile female prostitution enterprise that they organized; alternatively, the jury could have concluded that three pimps – Pipkins, Scooby, and KK – collectively headed up a prostitution enterprise involving juvenile females. In either case, the enterprise's activities included traveling intrastate and

15

interstate to prostitute juvenile females, recruiting juvenile prostitutes, attending the Player's Ball, mentoring a junior pimp, commingling funds and profits, and dividing the track to reduce competition among prostitutes.

We have previously summarized evidence that supports the notion that there was extensive cooperation among the southwest Atlanta pimps generally, all of whom associated on a continuing basis in an informal organization. But we now focus first on additional evidence that supports the conclusion that Pipkins and KK headed up a juvenile prostitution enterprise, and second, on evidence that supports an alternative conclusion that Pipkins, Scooby, and KK conducted the affairs of a juvenile prostitution enterprise.

Substantial evidence supports a finding that Pipkins and KK conducted a juvenile prostitution enterprise. We note some highlights. Pipkins and KK kept a stable of juvenile prostitutes, including JF5, JF6, "Red," "Candace" (who previously worked for Moore), JF48, "Sugar," "Lisa," "Special," "Too Tall" (who, although bearing a tattoo of "Sir Charles" on her leg, later became Moore's bottom girl), "Ne-ne," "Peaches," "Passion," "Kimberly," and "China Doll."[6] Pipkins and KK provided drugs to their prostitutes, and took them to the track to work. Also, Pipkins and KK

---

[6]      We use the convention JF to stand for "juvenile female." The associated number refers to a key used by the Government at trial, which is included in the record.

provided their prostitutes a place to live, food, clothing, condoms, and money to get their hair and nails done.

Pipkins brought KK into his enterprise by mentoring him as a junior pimp. After purchasing a copy of *Really Really Pimpin' in Da South* at a local barber shop, KK recognized Pipkins and sought his counsel on becoming a pimp. Pipkins invited KK to move into his house, and the two began a symbiotic business relationship. In addition to providing rides to the track for each other and each other's prostitutes, Pipkins and KK supervised each other's prostitutes and collected the money they earned.

Additionally, Pipkins disciplined his prostitutes in front of KK, teaching KK his method. For example, after Pipkins learned that JF5 had been smoking marijuana with one of Scooby's prostitutes, Pipkins directed JF5 to lay naked on the ground in front of Pipkins, KK, and other prostitutes. Pipkins then forced JF5 to have oral sex with JF6 (who had just returned from a night of prostitution) in the presence of Pipkins and KK.

Pipkins and KK worked the track together, with KK on-site and Pipkins appearing as necessary to prevent any disputes from escalating. The following anecdote illustrates such an agreement. JF6, one of Pipkins's prostitutes, formerly worked for Worm. While Worm was in jail, he gave JF6 to "Fantastic," an unindicted

17

pimp, but Worm later claimed that he had not been properly served. After Worm was released, KK was working the track one evening when Worm arrived and verbally assaulted JF6, who had moved to Pipkins from Fantastic. KK called Pipkins on a cell phone to inform him of the commotion, and Pipkins soon arrived to speak with Worm. Pipkins told Worm that because he got JF6 from someone else (and had apparently properly served that other pimp), Worm should consider himself served as well.

Most tellingly, Pipkins and KK had an agreement to operate in tandem. According to KK, Pipkins said that KK "had a good catch hand and that [Pipkins] had a good turn out hand, and that I could catch the girls and he would turn them out." (R.21 at 1484.) KK explained that this meant that he was adept at finding and bringing girls to Pipkins's house; Pipkins would win the girls' loyalties, explain the rules of the game, and convince them to prostitute for him and KK. KK also worked as a tattoo artist, and tattooed "Sir Charles" on one of Pipkins's prostitutes. KK took several of Pipkins's other prostitutes to get tattoos for which Pipkins paid. Clearly, there was evidence to support a finding that Pipkins and KK agreed to form an enterprise to make money through juvenile prostitution.

As we previously noted, an alternative view that has support in the evidence is that Pipkins, Scooby, and KK collectively could be viewed as the leaders of a

18

juvenile prostitution enterprise in which all of them participated. Pipkins traveled extensively with Scooby, driving out of town with him to prostitute females. They drove to Columbus, Georgia several times to prostitute in the back of The Foxy Lady, an adult entertainment establishment near a military base. Another time, Pipkins and Scooby went to Memphis, Tennessee to prostitute two girls at another strip club, The Queen of Hearts. Pipkins and Scooby traveled together because Scooby did not like to take long trips alone and because protection of their prostitutes was enhanced by having their prostitutes dance and work together. This benefitted the pimps because the prostitutes were more "motivated" to prostitute when their safety was assured.

While in Memphis, Pipkins and Scooby jointly persuaded a female working the drive-through window at McDonald's to quit on the spot and join Pipkins's organization in Atlanta. And, on another trip to Memphis, Scooby found a female who wanted to return with him to Atlanta to prostitute, but who did not have the looks required to join his stable. Remembering that Pipkins's driver's license was suspended and noting that this female had a car, Scooby contacted Pipkins on his cell phone and coaxed him to accept this female because she would be able to ferry both Pipkins and other prostitutes to and from the track.

In 1999, Pipkins, Scooby, Herman Hutson, Jr. (known as "Redd"), and Curtis Webb, Pipkins's tailor, along with one of Pipkins's prostitutes, traveled together to

19

the Player's Ball in Detroit, Michigan. The Player's Ball is an annual event, akin to a nationwide pimp trade show, which rotates through major cities. At the Player's Ball, pimps showcased their finest attire and prostitutes in the hopes of being named "Pimp of the Year." Pipkins, Scooby, and Redd were apparently the only pimps in attendance from Atlanta, and were disappointed to discover that the Pimp of the Year had been preselected from the host Detroit contingent. Pipkins took five prostitutes to a different Player's Ball in downtown Atlanta; Scooby also attended.

On another occasion, Pipkins and Scooby agreed to work different ends of the track to avoid direct competition and price undercutting between their prostitutes. Scooby testified that his and Pipkins's prostitutes had different "looks." Dividing the track into discrete "territories" reduced the likelihood of consumer confusion and of any possible price-related problems between the prostitutes.

From this copious evidence, the jury could have concluded that Pipkins participated in a RICO enterprise with Scooby and KK. Pipkins and Scooby functioned horizontally, traveling together, fixing prices on the track, and recruiting and swapping prostitutes with one another. In contrast, Pipkins and KK operated vertically with Pipkins serving as KK's mentor. Pipkins allowed KK to live in his house and groomed him as a successor, looking after his prostitutes while benefitting from KK's youth and rapport with juvenile females.

20

Whether it involved Pipkins, Scooby, and KK, or Pipkins and KK alone, the jury could have concluded that there was an informal, ongoing organization. The evidence supports a finding that there was continuous association among these pimps, and that they worked together to make money prostituting juveniles. Thus, we conclude that there was sufficient evidence that Pipkins agreed to participate in a RICO enterprise.

### b. Moore's Enterprise

We have previously outlined evidence that there was extensive cooperation among the indicted southwest Atlanta pimps generally. We now focus on additional evidence that supports the jury's conclusion that Moore agreed to participate in a RICO enterprise. Two plausible views of the evidence support this conclusion. One view is that Moore and his legal wife, Linda Moore, headed up a prostitution enterprise involving juvenile females. An alternative view is that Moore and other pimps with whom he was closely affiliated – Hollywood, Worm, Playboy, Black, and Little D – formed an enterprise to prostitute juvenile females. We now highlight evidence supporting these two views.[7]

---

[7] Moore advances the creative, yet hopeless contention that he could not have agreed to participate in an enterprise with other pimps because he was not considered a real pimp by other pimps and their prostitutes because he did not follow the rules of the game. In support of this assertion, Moore cites testimony from Hollywood that Moore was a mere "shoe man" and a ticket scalping "hustler," disrespected in the neighborhood for the way he conducted his affairs. The record negates Moore's claims. While the other denizens of Metropolitan Avenue may have looked down

21

As to the enterprise formed by Moore and his wife, the evidence showed that Moore had a bottom girl named "Too Tall" and employed many juvenile prostitutes, including 13-year-olds "Tasha," JF7, JF9, and JF37; 14-year-old JF15; and 15-year-olds "Lil Bit," JF8, JF12, JF22, JF33, and JF53. Moore drove several ostentatious vehicles (one of which he dubbed the "Batmobile") and worked the track with his prostitutes, collecting the proceeds from their dates and flagging down customers. Moore complied with the rules of the game, serving other pimps when prostitutes chose him and collecting money from other pimps when one of his prostitutes chose another pimp. Teaching his prostitutes the rules, Moore instructed his prostitutes to milk their dates for as much cash as possible, charging for each discrete sexual act or even each time they changed sexual positions. Moore disciplined his prostitutes for infractions by beating them, hitting them with a baseball bat, and trunking them. Finally, Moore directed his wife, Linda, a pimp also indicted in this case, to take his prostitutes shopping for clothes and to drive them to the track for work. On one occasion, 12-year-old JF11 received a call from a boyfriend named "Weasel" who told her that he and Moore were in a car outside her home and that she and her family would be killed if she didn't come out of the house. JF11 came out of the house and

---

upon Moore for being a "guerilla pimp," he was a pimp nonetheless. At trial, Hollywood, Worm, Scooby, and KK referred to Moore as a pimp. Contrary to Moore's assertions, the record overwhelmingly shows that he was a pimp who knowingly worked in concert with other pimps.

22

got into Moore's car. After Moore drove to his house, Weasel beat JF11 on her face. Moore and Weasel then tied JF11 to a bed with a telephone cord. Later, Moore untied JF11, ran errands, and then went to a mall and purchased clothes for her, telling her that if she didn't go with them, he would kill her. That night, Moore forced JF11 to have sexual intercourse with Hollywood, threatening to kill her if she refused. Moore took the money paid by Hollywood for sex with JF11. Even though JF11 escaped Moore's clutches after this incident, Moore returned to JF11's house and again threatened to kill her unless she went with him, which she did. Moore then took JF11 to another person's house, where JF11 was gang raped by three males.

There was convincing evidence that Moore, along with his wife, Linda, formed an enterprise to make money through prostitution of juveniles.

Even more clearly, the evidence showed that Moore formed an enterprise with Hollywood, Worm, Playboy, Black, and Little D. Hollywood testified that he and Moore recruited females together, and jointly hosted private prostitution parties at a local hotel. Moore also rented rooms in a boarding house to other pimps so that they could prostitute their females. Moore charged pimps different rates, depending on the level of cooperation between Moore and the pimp.

Worm, an indicted pimp who had pleaded guilty, testified at trial that "[i]t was just like birds of a feather flock together, pimps of a feather flock together. Pimps run

23

in a group, each one look out for each other." (R.18 at 987.) Worm testified that pimps looked out for each other by bonding each other's prostitutes out of jail, and that he "wouldn't let nobody down, if they need me I be there." (R.18 at 989.) Worm actively associated with Moore, Dwayne Comer (known as "Julio"), Anthony Bell (known as "Black"), and Landreaka Herndon (known as "Big D"). Most notably, Worm and Moore drove together to Anniston, Alabama at least five times to prostitute females. Once while in Alabama, Moore successfully recruited a prostitute to work for him in Atlanta. Worm also looked out for Moore by helping him with gas money and giving him money as needed for other tasks.

Mekell Astin, a neighborhood drug dealer, testified that Moore worked with Dwayne Comer (known as "Little D") and Black. On at least five occasions, Moore purchased marijuana and powder cocaine from Astin for his prostitutes, using the drugs as a reward or as a lure for other juvenile females. Moore introduced Astin to Terrance Ramsey (known as "Playboy,") another indicted pimp, who became one of Astin's customers.

Moore had a relationship with the local police. Worm testified that Moore sat in police vehicles and found out which nights the police would be conducting sweeps. Worm also testified that Moore revealed that "Tuesdays and Thursday is vice night,"

24

(R.19 at 1017), and that Worm and Moore drove prostitutes to Alabama on those nights to avoid arrest.

Moore and Hollywood colluded to keep the prices for dates on the track between $30 to $80.[8] On at least one occasion, Moore and Hollywood confronted another indicted pimp, Deunbray Rucker (known as "Poochie"), for undercutting the price range. Moore and Hollywood persuaded Poochie to rejoin the price fixing cartel, and agreed that they would force Poochie to leave the area if he tried to undercut prices again.[9]

The evidence showed Moore to be a central figure among these pimps, as he introduced Playboy to a drug dealer, traveled with Worm out of state to prostitute females, and served as a information conduit from the police to Worm and other pimps. Moore and Linda Moore functioned vertically, as she took direction from Moore about the maintenance of their stable of prostitutes. Hollywood, Worm, Playboy, Black, Little D, and Moore operated horizontally, exchanging favors and working together to accomplish their criminal objectives.

---

[8] While Moore notes testimony from Hollywood that the pimps did not collectively set prices for tricks, closer examination of the record reveals that Hollywood actually testified that the prices were "understood." (R.15 at 323; R.16 at 381.) The jury could have believed Hollywood's testimony that the pimps fixed prices through tacit agreement and enforced them through coercion and intimidation.

[9] This anecdote refutes the Defendants' conscious parallelism argument.

Based on this evidence, the jury could have concluded that Moore participated in a RICO enterprise. Whether the enterprise consisted of Moore and Linda Moore, or also included Hollywood, Worm, Playboy, Black, and Little D, the jury could have found that Moore was a member of an informal, ongoing organization with a continuing association, bound together to make money prostituting juvenile females. We therefore conclude that the evidence sufficiently supports a finding that Moore participated in a RICO enterprise.

### 2. The Effect on Interstate Commerce Issue

The substantive RICO offense, which the conspiracy statute references, requires proof that the enterprise was either (1) *engaged in* interstate commerce, or (2) that its activities *affected* interstate commerce. 18 U.S.C. § 1962(c); *United States v. Robertson*, 514 U.S. 669, 671, 115 S. Ct. 1732, 1733 (1995). The court's instructions to the jury (consistent with the indictment) required proof of one of these alternatives. We conclude that the evidence suffices to support these convictions under either alternative.

Both Pipkins and Moore used automobiles and the interstate highways to take underage prostitutes across state lines, as well as elsewhere in Georgia. Pipkins drove JF5 to Milwaukee, Wisconsin and most likely New York City where Pipkins prostituted her and kept the money. Scooby and Pipkins took prostitutes to work

26

champagne rooms at strip clubs in Memphis, Tennessee and recruited prostitutes on the same trip. Moore also recruited at least one prostitute from Alabama who worked for him in Atlanta. And, Worm and Moore drove to Anniston, Alabama to evade a police dragnet in Atlanta and prostitute females.

Additionally, the pimps and their prostitutes used instrumentalities of interstate commerce – pagers, telephones, and mobile phones – to communicate with each other while conducting business. Pipkins used the Internet to promote his online escort service which advertised JF48 and JF54 as prostitutes. *See United States v. Panfil*, 338 F.3d 1299, 1300 (11th Cir. 2003) (referring to the Internet as an "instrument of interstate commerce.") Finally, the pimps furnished their prostitutes with condoms manufactured out of state, purchased from Atlanta gas stations.

This evidence undoubtedly supports a finding that the enterprise was engaged in interstate commerce. It also supports a finding that the activities of the enterprise affected interstate commerce.[10] Because the evidence was sufficient to support the jury's finding, we affirm their RICO conspiracy convictions.

B. The Hobbs Act Extortion Convictions

---

[10] The Government argues that only a "slight" effect on interstate commerce is required, citing *United States v. Beasley*, 72 F.3d 1518, 1526 (11th Cir. 1996). The Defendants argue that a "substantial" effect on interstate commerce is required, citing *United States v. Lopez*, 514 U.S. 549, 559, 115 S. Ct. 1624, 1630 (1995). These arguments need not detain us because the evidence in this case suffices under either the "slight" or "substantial" standard.

The jury convicted both Defendants of violating the Hobbs Act by extorting money from juvenile prostitutes. The Hobbs Act criminalizes conduct that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion . . . ." 18 U.S.C. §1951(a).

### 1. Pipkins's Conduct was Extortion

Pipkins contends that his conduct did not amount to extortion; this contention is meritless. Extortion is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . . ." 18 U.S.C. § 1951(b)(2). According to Pipkins, the juvenile females voluntarily turned over their prostitution earnings to him as part of the rules of the game, which they knew about prior to beginning their "independent contractor" relationship with him. Therefore, he argues, the money never belonged to the prostitutes, and thus, any force or violence Pipkins used to extract "his" money from his prostitutes could not constitute extortion.

Pipkins's view of the facts is belied by the record. JF33 testified that she gave all of her money earned through prostitution to Pipkins because she had no choice, as Pipkins would beat her if she kept the proceeds for herself. When Pipkins learned that she had kept earnings, Pipkins hit her. JF5 also turned over all of the money she

28

earned prostituting for fear of Pipkins beating her. These earnings were substantial: one night, Pipkins required her to meet a quota of $1,000.

Pipkins instituted and perpetuated a system in which his juvenile prostitutes turned over their earnings because of his threats and physical violence. This supports Pipkins's convictions on the Hobbs Acts extortion charges.

### 2. The District Court's Hobbs Act Instruction

The Defendants also contend that the district court improperly instructed the jury on the interstate commerce element of the Hobbs Act charge. We review this issue for plain error because neither Defendant objected to the jury instruction in the district court. *United States v. Puche*, 350 F.3d 1137, 1148 (11th Cir. 2003). "We will find plain error only where (1) there is an error; (2) the error is plain or obvious; (3) the error affects the defendant's substantial rights in that it was prejudicial and not harmless; and (4) the error seriously affects the fairness, integrity, or public reputation of a judicial proceeding." *United States v. O'Neal*, 362 F.3d 1310, 1316 (11th Cir. 2004) (internal quotations and citations omitted).

The district court instructed the jury:

> While it is not necessary to prove that the defendant specifically intended to interfere with interstate commerce, it is necessary that the Government prove that it was realistically probable that the natural consequences of the acts alleged in the indictment would be to delay, interrupt or affect interstate commerce, which means the flow of

commerce or business activities between two or more states. The effect shown may be minimal.

The evidence is insufficient if it rests only on speculation about whether individuals might have spent money differently but for any extortionate act which you might find.

(R.24 at 1896.)  Specifically, the Defendants contend that the phrase "realistically probable that the natural consequences of the acts alleged in the indictment would be to . . . affect interstate commerce . . . " allowed the jury to convict them without proof of an actual effect on interstate commerce. *See United States v. Diaz*, 248 F.3d 1065, 1085 (11th Cir. 2001) (requiring an actual effect on interstate commerce to support a Hobbs Act conviction.)

The instruction given the jury is similar to Eleventh Circuit Pattern Jury Instruction 66.3,[11] which we approved in *United States v. Castleberry*, 116 F.3d 1384, 1389 (11th Cir. 1997).  While the pattern jury instruction does not contain the phrase "realistically probable," the Government contends that we have held that "the government need only show a realistic probability of an effect, or some actual de minimis effect, on commerce to bring the extortion within the reach of the Hobbs Act." *United States v. Kaplan*, 171 F.3d 1351, 1354 (11th Cir. 1999) (en banc).

---

[11]     Pattern Instruction 66.3 requires "that the Government prove that the natural consequences of the acts alleged in the indictment would be to delay, interrupt or adversely affect 'interstate commerce . . . .'" Eleventh Circuit Pattern Instruction (Criminal Cases) 66.3.

30

Careful review of the cases themselves reveals a fracture in the Government's argument. In *Kaplan*, we spoke of "reasonable probability" in the context of the inchoate Hobbs Act offenses of attempt to extort and conspiracy to extort. 171 F.3d at 1354. But here, the Government sought convictions for violations of the Hobbs Act by means of actual extortion. The *Kaplan* case, therefore, is inapposite.

Even so, comparing the language of the pattern jury instruction – "natural consequences" – with the language the district court used – "realistically probable" – we conclude that any error that may have occurred had no effect on the Defendants' substantial rights or the "fairness, integrity, or public reputation of the judicial proceedings." *United States v. Hall*, 312 F.3d 1250, 1259 (11th Cir. 2002) (citations omitted). Therefore, the district court did not plainly err in instructing the jury on the interstate commerce element.

### C. Pipkins's Involuntary Servitude Conviction

Pipkins contends that the evidence was insufficient to support his conviction for unlawfully and willfully holding or selling 15-year-old JF5 in involuntary servitude, in violation of 18 U.S.C. § 1584 ("Whoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any person for any term . . . " has committed the offense of involuntary servitude.).

31

A conviction under § 1584 requires proof that "the victim [was] forced to work for the defendant by the use or threat of physical restraint or physical injury . . . ." *United States v. Kozminski*, 487 U.S. 931, 952, 108 S. Ct. 2751, 2765 (1988). If a defendant keeps a victim in involuntary servitude through such fear of physical harm that the victim is afraid to leave, regardless of any opportunity to escape, the defendant has violated § 1584. *See United States v. Warren*, 772 F.2d 827, 833 (11th Cir. 1985).

Pipkins argues that he could not have placed JF5 in involuntary servitude, as she was free to leave at any time. Pipkins notes that JF5 first prostituted for herself, then "bounced" from Lil Jeff to Playboy to Black to Cowboy before prostituting for Pipkins. Then, after prostituting for Pipkins for two to three weeks, JF5 left Pipkins for Scooby, then returned to Pipkins, and left again to work for Scooby. Pipkins asserts that the first time JF5 left, she did so voluntarily, leaving with one of Scooby's prostitutes. And, after leaving, she maintained contact with Pipkins either by telephone or in person in his home.[12]

---

[12]     Pipkins also contends that *Kozminski* casts doubt on the continuing viability of *Warren* because *Kozminski* explicitly rejected the notion that involuntary servitude could be accomplished through psychological coercion or persuasion. *Kozminski*, 487 U.S. at 949, 108 S. Ct. at 2763-64. We need not address whether *Kozminski* pruned back *Warren*, because record evidence shows that JF5 was in fear of a physical reprisal from Pipkins, which is sufficient to comply with *Kozminski*. In proving involuntary servitude, the Government did not rely upon any of Pipkins's psychological machinations. And, the jury could properly have considered that JF5 was particularly susceptible to Pipkins's coercion because of her youth. *See Kozminski*, 487 U.S. at 952, 108 S. Ct.

32

We reject this argument. Pipkins held JF5 in involuntary servitude by forcing her to prostitute herself and turn over all of her earnings to him, lest she endure a beating at his hands. On one occasion, he gave her a $1,000 quota for the night before she could return home. He also had sexual intercourse with her; she testified that she didn't have a choice because Pipkins was "intimidating." And, in KK's presence, he punished her for smoking marijuana with one of Scooby's prostitutes by forcing her to have oral sex with another prostitute, JF6, who had just returned from a night of prostituting. Relating to this forced sexual encounter, JF5 testified that Pipkins told her that he wouldn't hit her, but that he didn't have to hit her to hurt her.

Section 1584 requires that involuntary servitude be for "any term," which suggests that the temporal duration can be slight. Thus, the language of § 1584 negates Pipkins's argument that JF5 was never in involuntary servitude because she freely traveled between pimps. The record supports a finding that Pipkins held JF5 in involuntary servitude for at least part of the time that she prostituted for him.

We therefore conclude that the evidence was sufficient to support Pipkins's conviction for involuntary servitude of JF5.

D. Pipkins's Transfer of False Identification Documents

---

at 2765 (holding that victim vulnerabilities were "relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve.")

Pipkins also challenges his conviction for unlawful transfer of false identification documents to JF33, in violation of 18 U.S.C. § 1028(a)(2), (b)(1)(A)(ii), and (c)(3)(A). He argues that the evidence at trial was insufficient to prove that he committed this offense. Because Pipkins failed to move for judgment of acquittal on this count at trial, we will reverse on sufficiency of the evidence grounds only if the record reveals that there has been a manifest miscarriage of justice. *See United States v. Adams*, 91 F.3d 114, 116 (11th Cir. 1996).

To support a conviction under § 1028(a)(2), the Government had to prove that Pipkins "knowingly transfer[ed] an identification document or a false identification document knowing that such document was stolen or produced without lawful authority." 18 U.S.C. § 1028(a)(2). Section 1028(d)(4) defines the term "false identification document" as "a document of a type intended or commonly accepted for the purposes of identification of individuals that . . . appears to be issued by or under the authority of the United States Government, a State, [or] a political subdivision of a State . . . ." 18 U.S.C. § 1028 (d)(4)(B). Also, the transfer had to be in or affecting interstate commerce. 18 U.S.C. § 1028(c)(3)(A).

Pipkins complains that the record is devoid of evidence to sustain his conviction on this count because the evidence did not show that the false identification JF33 received was of a kind described in § 1028(b)(1)(A), which was

34

the basis of his conviction. That subsection defines false identification documents to include a birth certificate, a driver's license, or a personal identification card. He argues that because the evidence did not show the exact type of identification JF33 received, he cannot be guilty of violating § 1028.[13] Pipkins also contends that the Government failed to prove that the false identification transfer affected interstate commerce.

The record negates Pipkins's first challenge. There was evidence that Pipkins knew that JF33 was 15 years old when he began prostituting her. Pipkins planned to

---

[13]     Title 18, U.S.C. § 1028(b)(1)(A) provides for a 15-year sentence if the offense involved a federally-issued identification document, a birth certificate, a driver's license, or a personal identification card, while Section 1028(b)(2) provides for a three-year sentence for transferring any other false document of identification. Pipkins contends for the first time on appeal that the district court erred by sentencing him to the statutory maximum of 15 years' imprisonment for transferring false documents of identification, in violation of §1028(b)(1)(A). Specifically, he argues that the district court erred by sentencing him to 15 years because the verdict form the jury filled out did not require the jury to find specifically that the false identification document was one listed in § 1028(b)(1)(A). Because Pipkins raises this for the first time on appeal, we review for plain error. The indictment charged Pipkins with providing false identification documents to several juvenile females (R.2-404 at 12), and the indictment clarified that this was an act "indictable under Title 18, United States Code, Section 1028 (knowingly and unlawfully transferring false identification documents, which appeared to be birth certificates, driver's licenses, and personal identification cards, knowing that such documents were produced without lawful authority . . .)", *id.* at 5. When the judge charged the jury on the crime of transferring false identification documents, he told them that:

> The Defendant can be found guilty of this offense if four elements are proven: that the Defendant transferred to another a false identification document, which appeared to be either a birth certificate, a driver's license or a personal identification card, and that document was produced without lawful authority. . . .

(R.24 at 1899.) Based on the indictment and the jury instruction, the jury's finding could only have been that Pipkins had transferred one of the forms of false identification listed in § 1028(b)(1)(A). Thus, the district court committed no error by not specifying the forms of identification on the verdict form.

35

take her to Columbus, Georgia to work in a strip club, so he took her to a local flea market to get a false identification card made so that she could enter and dance at the men's club. In addition, Pipkins provided his other underage prostitutes with false birth certificates and false Social Security cards; for example, Pipkins took JF5 and another juvenile prostitute to a flea market to make false Social Security cards. Considering the evidence in the light most favorable to the Government, it was reasonable for the jury to infer that Pipkins transferred to JF33 a false identification document of the kind described in § 1028(b)(1)(A).

We also reject Pipkins's interstate commerce argument. Pipkins took JF33 to get false identification to be able to dance and prostitute in strip clubs in Columbus, Georgia. JF33 did indeed travel with Pipkins to Columbus, where she worked for him at two clubs and turned over all of her earnings to him. This trip to Columbus satisfies the interstate commerce requirement of § 1028. *See United States v. Villarreal*, 253 F.3d 831, 834-35 (5th Cir. 2001) (stating that the interstate commerce connection was satisfied if false identification documents might have traveled in or affected interstate or foreign commerce, and holding defendant's attempt to sell false identification documents satisfied the commerce prong.)

Because the evidence was sufficient to convict Pipkins under 18 U.S.C. § 1028, and the transfer affected interstate commerce, we affirm Pipkins's conviction for transfer of false identification documents.

## V.  SENTENCING ISSUES

Pipkins and Moore present several arguments challenging their sentences.[14] Two are worthy of discussion.

A.    Did the District Court Err when It Sentenced the Defendants under U.S.S.G. § 2G1.1, the Guideline for the Crime of Promoting Prostitution?

Pipkins and Moore challenge the district court's application of U.S.S.G. § 2G1.1 (2001) in calculating their sentences for the offense of promoting prostitution. They contend the court erred by incorrectly applying a cross-reference in the guideline rather than an enhancement.

Section 2G1.1, the guideline for the crime of promoting prostitution, provides for a base offense level of 19, if the offense involved a minor.  U.S.S.G. § 2G1.1(a)(1).  The guideline directs the sentencing judge to *enhance* the base offense

---

[14]    Moore also makes the meritless contention that the district court clearly erred by finding that Moore was an organizer or leader of criminal activity, and thereby increasing the offense levels for each of his crimes by 4 levels.  Moore was clearly "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," U.S.S.G. §3B1.1(a) (2001), as he exercised decision-making authority, participated in the commission of the offenses, recruited accomplices, and took the lion's share of the fruits of the crimes, *see id.* at comment. (n.4). Thus, the court did not clearly err in concluding that Moore was an organizer or leader.

level based on any of several specific offense characteristics. One of these enhancements, § 2G1.1(b)(1), reads: "[i]f the offense involved (A) prostitution; and (B) the use of physical force, or coercion by threats or drugs or in any manner, increase by 4 levels." *Id*. at (b)(1).

As an alternative to an enhanced base offense level, the guideline also includes several *cross-references*, which direct the sentencing judge to apply a different guideline under certain circumstances. The district court applied the § 2G1.1(c)(2) cross-reference, which provides: "If the offense involved criminal sexual abuse, attempted criminal sexual abuse, or assault with intent to commit criminal sexual abuse, apply § 2A3.1 (Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse)." *Id*. at (c)(2). "Criminal sexual abuse" is defined by 18 U.S.C. § 2241 as "knowingly . . . caus[ing] another person to engage in a sexual act – by threatening or placing that other person in fear . . . ." 18 U.S.C. § 2241(a)(2). The criminal sexual abuse guideline (U.S.S.G. § 2A3.1) provides for a base offense level of 27. § 2A3.1(a).[15]

_____

[15] Defendants argued in the district court, and (under a liberal reading of their briefs) argue here that their conduct did not satisfy § 2241's definition of sexual abuse because their abusive acts did not take place "in the special maritime and territorial jurisdiction of the United States or in a Federal prison." 18 U.S.C. § 2241. Because their actions took place outside these jurisdictions, they argue that the court was precluded from applying § 2A3.1, the criminal sexual abuse guideline. We reject this argument, agreeing with the First and Third Circuits that § 2A3.1's criminal sexual abuse guideline applies without regard to the jurisdictional requirements of 18 U.S.C. § 2241, where the underlying relevant conduct is present. *United States v. Dolloph*, 75 F.3d 35, 39-40 (1st Cir.

Pipkins and Moore contend that the district court erred by applying the cross-reference rather than the four-level enhancement. They argue that the district court misinterpreted the cross-reference to require only the use of physical force in the context of a prostitution offense. This reading must have been a misinterpretation, they argue, because it caused the cross-reference to subsume the enhancement, which applies where the defendant used physical force. Their contention is without merit: the district judge did not misinterpret the guideline, but properly found that both Defendants caused underage girls to engage in sex acts by placing them in fear.

Specifically, the court found that Pipkins forced one juvenile to engage in a sex act with another juvenile by threatening to "mess up" the first juvenile's face. (Pipkins Presentence Investigation Report (" PSI") at ¶ 668.) And, the court found that Moore, using a gun, forced a juvenile female to perform a sex act on an adult male, and that the male paid Moore for the sex act. (Moore PSI at ¶621.) Based on

1996); *United States v. Pollard*, 986 F.2d 44, 46-47 (3d Cir. 1993). This is because the guidelines are concerned with properly punishing a defendant for the bad conduct relevant to his offense of conviction. *Dolloph*, 75 F.3d at 40; *Pollard*, 986 F.2d at 47. It matters not that the federal courts might not have jurisdiction to try the defendant for each separate bad act, so long as a jurisdictional basis exists for the underlying prosecution to which the bad acts are relevant. *Pollard*, 986 F.2d at 47. The intent of the cross-reference in § 2G1.1(c)(2) is made clear by its language and by Application Note 10 which guides a judge in applying the cross-reference: § 2A3.1 "shall apply" when criminal sexual abuse conduct is relevant to the offense of conviction. *Dolloph*, 75 F.3d at 40. Thus, the court properly applied §2A3.1 notwithstading the absence of the jurisdictional requirements of 18 U.S.C. § 2241.

these findings, the court properly followed the cross-reference to § 2A3.1, fixing Defendants' offense levels based on that section, and sentencing them accordingly.

Pipkins and Moore argue that the district court's reading of the cross-reference would always subsume the enhancement. They are wrong; it would not. For example, a pimp's beating a prostitute because he learned that she was skimming proceeds ("cuffing") would satisfy the enhancement (which requires prostitution plus physical violence) but not the cross-reference (which requires using violence or threats to make a person perform a sex act). *See United States v. Campbell*, 49 F.3d 1079, 1086 (5th Cir. 1995) ("[A]n enhancement is justified if a court finds that the offense only 'involved the use of physical force,' even if the force was not used to coerce.") (quoting § 2G1.1(b)(1)). Similarly, a pimp's threatening a prostitute to coerce her to stay in his custody would also satisfy the enhancement (which requires prostitution plus coercion) but not the cross-reference (which requires coercion to perform a sex act). *See United States v. Williams*, 291 F.3d 1180, 1197 (9th Cir. 2002) (holding that the enhancement was warranted where the defendant used force "to intimidate his prostitutes and ensure their continued participation").

Here, Defendants' conduct does satisfy both the enhancement and the cross-reference. But, some overlap in the enhancement and the cross-reference does not offend the Sentencing Guidelines or any other law. A district judge confronted with

40

such an overlap is not free to choose between the enhancement and the cross-reference: when there is this overlap, the judge must apply the cross-reference. U.S.S.G. § 2G1.1, comment. (n.10) ("[T]he cross reference to § 2A3.1 shall apply if the offense involved criminal sexual abuse . . . ."); *cf. United States v. McQueen*, 86 F.3d 180, 182-83 (11th Cir. 1996) (noting that a similarly-worded cross-reference found in U.S.S.G. § 2J1.2(c)(1) was mandatory, where the required circumstances were present).

For these reasons, the district court properly applied the § 2G1.1(c)(2) cross-reference.

B.      Did the District Court Err in Calculating Defendants' Offense Levels under U.S.S.G. § 2H4.1(b)(4), the Guideline for Subjecting a Person to Involuntary Servitude?

Pipkins and Moore next argue that the district court erred in applying U.S.S.G. § 2H4.1 (2001), the guideline for involuntary servitude offenses.

This guideline sets the base offense level at 22, but then directs the district court to increase the base offense level where the defendant committed "any other felony offense . . . during the commission of, or in connection with, the peonage or involuntary servitude offense." *Id*.  The sentencing court is to increase the base offense level to the greater of: (A) the involuntary servitude (§ 2H4.1(a)) base offense level, plus 2 points; or (B) the base offense level of the most serious other federal,

41

state, or local felony offense committed in connection with the involuntary servitude offense, plus 2 points. § 2H4.1(b)(4), comment. (n.2).

The district court found that during their involuntary servitude offenses, Defendants aided and abetted the Georgia felonies of child molestation and aggravated child molestation (Ga. Code Ann. § 16-6-4), and statutory rape (Ga. Code Ann. § 16-6-3). Thus, the court applied the base offense level for these acts, found at U.S.S.G. § 2A3.1, the criminal sexual abuse guideline. Pipkins and Moore contend that this was error: that the court failed to engage in the analysis necessary to determine that § 2A3.1 was the most analogous guideline for the Georgia felony offenses.

We discern no error in the court's application. Defendants do not contend that they did not aid and abet these particular Georgia felony offenses during their involuntary servitude offenses. Instead, they hint that if the court had conducted a more searching survey of the Sentencing Guidelines, it might have found that a guideline less severe than § 2A3.1 was the most analogous guideline for these state-law felony offenses. But, they fail to point to a more analogous guideline, and we find none. *Cf. United States v. Lucas*, 157 F.3d 998, 1001-02 (5th Cir. 1998) (holding that § 2A3.1 was the most analogous guideline where the defendant's relevant conduct was forcing a woman, against her will, to have sexual intercourse). *See also*

U.S.S.G. § 2X2.1 (2001) (providing that where the relevant conduct is aiding and abetting an offense, then the "offense level is the same level as that for the underlying offense"). They also fail to point out any missed steps in the district court's analysis. Thus, they fail to show any error in the court's application of § 2A3.1.[16]

## VI. CONCLUSION

For the foregoing reasons, the convictions and sentences of Pipkins and Moore are

AFFIRMED.

---

[16] While Moore objected on this basis in the district court, Pipkins did not, and thus plain error analysis applies to Pipkins's contention on appeal. Because we conclude that the district court committed no error in this regard, we necessarily conclude that the court committed no plain error. Pipkins also contends on appeal that the district court erred in calculating his base offense level for involuntary servitude by increasing the 22-point base offense level by 2 levels under § 2H4.1(b)(1)(B), based on the court's finding that Pipkins caused a victim serious bodily injury. But, because the court ultimately applied § 2A3.1, the criminal sexual abuse guideline, to determine Pipkins's base offense level for involuntary servitude, the 2-level increase had no effect on his sentence. Thus, we need not consider this contention.